Anthony M. Barnes (Bar No. 199048)
Jason R. Flanders (Bar No. 238007)
Email: amb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
409 45th Street
Oakland, CA 94609
Phone: (415) 326-3173

Colin Kelly (Bar No. 266956)
Email: colin@coastkeeper.org
Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, CA 92626
Phone: (714) 850-1965

*Attorneys for Plaintiff*
ORANGE COUNTY COASTKEEPER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>ALUMINIUM PRECISION PRODUCTS, INC., a California corporation,<br><br>       Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On February 22, 2019, Coastkeeper issued 60-day notice letters ("Notice Letters") to Aluminum Precision Products, Inc. ("Defendant" or "Aluminum Precision"). The Notice Letters informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ*) ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122-DWQ ("2015 Permit") (collectively, the "Storm Water Permit"), and recently amended but not yet adopted Order No. 20XX-XXX-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit"), and Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, at two Aluminum Precision manufacturing facilities: (1) located at 3223 Warner Avenue and 3333 Warner Avenue, Santa Ana, CA 92704, with the primary address of 3333 Warner Avenue, Santa Ana, CA 92704 ("Warner Facility"); and (2) six separate buildings located around Susan Street, California, with the primary address of 2621 South Susan Street Santa Ana, California 92704 ("Susan Facility").[1] The Warner and Susan

---

[1] The "Susan Facility" is comprised of six buildings on six separate parcels located at 3209 W. Central Ave, Santa Ana, CA, 92704; 3210 W. Central Ave, Santa Ana, CA,

1   Facilities are collectively referred to herein as the "Aluminum Precision Facilities,"

2   unless otherwise distinguished. The Notice Letters informed Defendant of Coastkeeper's

3   intent to file suit against Defendant to enforce the Storm Water Permit and the Clean

4   Water Act.

5       3.      The Notice Letters were sent to the current Chief Executive Officer, plant

6   engineer, and the registered agent for Aluminum Precision, as required by 40 C.F.R. §

7   135.2(a)(1). The Notice Letters was also sent to the Administrator of the United States

8   Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the

9   Executive Director of the State Water Resources Control Board ("State Board"), and the

10  Executive Officer of the Regional Water Quality Control Board, Santa Ana Region,

11  ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. §

12  1365(b)(1)(A). The Notices Letters are attached hereto as Exhibit A and Exhibit B and

13  are incorporated herein by reference.

14      4.      More than sixty (60) days have passed since the Notice Letters were served

15  on the Defendant and the State and Federal agencies. Coastkeeper is informed and

16  believes, and thereon alleges, that neither the EPA nor the State of California has

17  commenced or is diligently prosecuting an action to redress the violations alleged in the

18  Notice Letters and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not

19  barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. §

20  1319(g).

21      5.      Venue is proper in the Central District of California pursuant to Section

22  505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

23  located within this judicial district.

24      6.      Plaintiff also seeks relief from Defendant's violations of the procedural and

25  substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

26

27  _____

    92704; 3132 W. Central Ave, Santa Ana, CA, 92704; 2621 S. Susan Street, Santa Ana,
28  CA, 92704; 2631 S. Susan Street, Santa Ana, CA, 92704; and 3151 W. Adams Street,
    Santa Ana, CA, 92704.

    Complaint for Declaratory and Injunctive Relief       3
    and Civil Penalties

1    **II.**     **INTRODUCTION**

2          7.     With every rainfall event, hundreds of millions of gallons of polluted

3    rainwater, originating from industrial operations such as the Aluminum Precision

4    Facilities, pour into storm drains and local waterways. The consensus among regulatory

5    agencies and water quality specialists is that storm water pollution accounts for more than

6    half of the total pollution entering marine and river surface waters each year. These

7    surface waters, known as Receiving Waters, are ecologically sensitive areas. Although

8    pollution and habitat destruction have drastically diminished once-abundant and varied

9    fisheries, these waters are still essential habitat for dozens of fish and bird species as well

10   as macro-invertebrate and invertebrate species. Storm water and non-storm water contain

11   sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead,

12   mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other

13   pollutants. Exposure to polluted storm water harms the special aesthetic and recreational

14   significance that the surface waters have for people in the surrounding communities. The

15   public's use of the surface waters exposes many people to toxic metals and other

16   contaminants in storm water and non-storm water discharges. Non-contact recreational

17   and aesthetic opportunities, such as wildlife observation, are also impaired by polluted

18   discharges to the Receiving Waters.

19         8.     High concentrations of total suspended solids ("TSS") degrade optical water

20   quality by reducing water clarity and decreasing light available to support photosynthesis.

21   TSS has been shown to alter predator-prey relationships (for example, turbid water may

22   make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants,

23   and benthic organisms. TSS can also be harmful to aquatic life because numerous

24   pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are

25   adsorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of

26   toxins associated with those sediments. Inorganic sediments, including settleable matter

27   and suspended solids, have been shown to negatively impact species richness, diversity,

28   and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in standard units ("s.u.") represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

10.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Aluminum Precision Facilities.[2]

11.     Coastkeeper specifically alleges that Defendant's discharge of pollutants from Aluminum Precision Facilities into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

III.     **PARTIES**

A.     **Orange County Coastkeeper**

12.     Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

13.     Coastkeeper has over 6,000 members who live and/or recreate in and around the Santa Ana River, Huntington Beach State Park, and the greater Santa Ana River Watershed. Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean

---

[2] The Aluminum Precision Facilities are fully described in Section V below.

Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.    Coastkeeper's members use and enjoy the waters near the Aluminum Precision Facilities, including the Santa Ana River, and Huntington Beach State Park to view wildlife, recreate, sail or boat, swim, kayak, windsurf, standup paddleboard, birdwatch, picnic, fish, hike, dive, conduct scientific study and research, and/or for aesthetic enjoyment.

15.    Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted storm water from the Aluminum Precision Facilities, negatively impacts and impairs Coastkeeper's use and enjoyment of, and Coastkeeper's members' use and enjoyment of, these waters.

16.    The interests of Coastkeeper and Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

17.    Continuing commission of the acts and omissions alleged herein will irreparably harm Coastkeeper and Coastkeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.    The Owners and Operators of the Aluminum Precision Facilities**

18.    Coastkeeper is informed and believes, and thereon alleges, that Aluminum Precision Products, Inc. maintains its headquarters at 3333 Warner Avenue, Santa Ana, CA 92704.

19.    Coastkeeper is informed and believes, and thereon alleges, that Aluminum Precision is the owner of the Aluminum Precision Facilities.

20.    Coastkeeper is informed and believes, and thereon alleges, that Aluminum Precision is the operator of the Aluminum Precision Facilities.

21.     Coastkeeper refers to Defendant as the "Aluminum Precision Facilities Owner and/or Operator."

22.     Coastkeeper is informed and believes, and thereon alleges, that Defendant is an active California corporation registered in California.

23.     Coastkeeper is informed and believes, and thereon alleges, that the registered agent for service of process for Aluminum Precision is Roark L. Keeler, Aluminum Precision Products, Inc., 3333 W. Warner Avenue, Santa Ana, California 92704.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

24.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

25.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b).

26.     Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

27.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

28.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

29.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

30.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

31.     "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

32.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

33.     The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

34.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

35.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

36.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

37.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

38.     The Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

39.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

40.     Each separate violation of the Clean Water Act occurring before November 2, 2015 commencing five years prior to the date of this Notice of Violation and Intent to File Suit subjects Aluminum Precision to a penalty of up to $37,500 per day for each violation; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects Aluminum Precision to a penalty of up to $53,484 per day for each violation, pursuant to Sections 309(d) and 505 of the CWA. *See* 33 U.S.C. § 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

41.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.     California's Storm Water Permit**

42.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

43.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits.

44.     The Storm Water Permit is an NPDES permit issued pursuant to CWA Section 402(p). 33 U.S.C. §1342(p). Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

45.     California has designated the State Board and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006).

46.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

47.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

48.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

49.     On July 1, 2015 the 2015 Permit became effective and was issued as NPDES General Permit No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id.* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

50.     On November 6, 2018, the State Board issued an amended but not yet adopted Order No. 20XX-XXX-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit").

51.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

52.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect

to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

### C.   The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

53.   The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

54.   Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of BAT for toxic or non-conventional pollutants, and BCT for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

55.   Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

56.   Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

57.     The EPA-established Benchmarks for the following parameters, among others, are as follows: pH—6.0 to 9.0 s.u.; TSS—100 mg/L; aluminum—0.75 mg/L; magnesium—0.064 mg/L ; iron—1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; copper—0.0123 mg/L; and zinc—0.11 mg/L. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmarks.

58.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public comment period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

59.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges from adversely impacting human health or the environment.

60.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

61.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

62.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

63.     Once WQS are established for a waterbody, any NPDES permit authorizing discharges of pollutants into that waterbody must ensure that their applicable WQS will be met. 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

64.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

65.     The Water Quality Control Plan for the Santa Ana River Basin (Basin Plan), California Regional Water Quality Control Board, Santa Ana Region, 4th Ed., (Rev. February 2016) ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for the Receiving Waters herein include, at a minimum: 1) Greenville Banning Channel: warm freshwater habitat (WARM), wildlife habitat (WILD); 2) Santa Ana River: preservation of biological habitats of special significance (BIOL), wildlife habitat (WILD), rare, threatened, or endangered species (RARE), marine habitat (MAR), estuarine habitat (EST), water contact recreation (REC1), non-contact water recreation (REC2), commercial and sportfishing (COMM); 3) Huntington Beach State Park: preservation of biological habitats of special significance (BIOL), wildlife habitat (WILD), rare, threatened, or endangered species (RARE), marine habitat (MAR), spawning, reproduction and development (SPWN), water contact recreation (REC1), and non-contact water recreation (REC2). *See* Basin Plan, at Table 3-1.

66.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2016 303(d) List of Impaired Water Bodies, Huntington Beach State Park is impaired for polychlorinated biphenyls ("PCBs") and the Santa Ana River is impaired for Indicator Bacteria[3]

67.     Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges in violation of the Storm Water Permit. The Basin Plan sets forth, among other things, narrative WQS, for

[3] 2016 Integrated Report – All Assessed Waters, *available at* (last accessed on Apr. 1, 2019). https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml

Complaint for Declaratory and Injunctive Relief          14
and Civil Penalties

pollutants including: floating material, algae, chemical oxygen demand, oil & grease, sediment, settleable matter, suspended materials, and toxic substances, and sets forth numeric WQS for chemical oxygen demand and pH. *See* Basin Plan, p. 4-6 to 4-18, and Table 4-1.

68.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors."

69.     The Basin Plan provides that "[t]he pH of bay or estuary waters shall not be raised above 8.6 or depressed below 7.0 as a result of controllable water quality factors; ambient pH levels shall not be changed more than 0.2 units."

70.     The Basin Plan includes a toxicity standard which states that "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses."

71.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

72.     The CTR includes numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), and sets forth lower numeric limits for zinc and other pollutants. CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[4]

73.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for

---

[4] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

74.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

75.     Receiving Water Limitations C(3) and C(4) of the 1997 Permit require a permittee whose discharges exceed the Storm Water Permit's Receiving Water Limitations to submit a written report identifying what additional BMPs will be implemented to achieve water quality standards.

### D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements

76.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

77.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction

of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

78.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

79.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

80.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation,

the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id.*, Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id.*

81.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via SMARTS within 30 days. 2015 Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); 2015 Permit, Fact Sheet, Section II (I)(1).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

82.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id.* at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in storm water and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

83.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge

Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

84.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*., 1997 Permit Section B(2)(c) and B(2)(d).

85.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

86.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

87.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of storm water discharges.

88.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

89.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

90.     Section B(5)(a) of the 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet

Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

91.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

92.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

93.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

94.     Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

95.     Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

96.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

97.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

98.     Section VI(B) of the 2015 Permit requires facilities classified as Standard Industrial Classification ("SIC") code 3463 – Nonferrous Forgings – such as the Aluminum Precision Facilities, to analyze storm water samples for aluminum, zinc, N+N, and iron. The 2015 Water Permit classifies facilities with SIC code 3463 under "Fabricated Metal Products." See 2015 Permit §XI(B) Table 1. See 2015 Permit, § VI(B) at Table 1.

99.     Section XI(B)(6) of the 2015 Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

100.   Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.      STATEMENT OF FACTS

### A.      The Warner Facility Site Description

101.   Coastkeeper is informed and believes, and thereon alleges, that the Warner Facility is located near the intersections of Warner Avenue and Yale Street, in Santa Ana,

California 92704. The addresses are 3333 W. Warner Ave and 3323 W. Warner Ave, Santa Ana, California 92704. This Facility is spread across three (3) accessor's parcel numbers: 408-191-04, 408-191-05, and 408-191-06.

102.   The Warner Facility is classified as conforming to SIC code 3463 (Fabricated Metal Products).

103.   Coastkeeper is informed and believes, and thereon alleges, that the Warner Facility site is identified in the May 2015 Notice of Intent submitted to the Regional Board ("Warner 2015 NOI") as approximately 9.8 acres in size.

104.   Coastkeeper is informed and believes, and thereon alleges, that the Warner Facility is comprised of and contains, among other areas and materials, has two large buildings and one small storage building on contiguous parcels. One building serves as the company headquarters, and is used for final product shipping, includes a machine shop, and storage areas for parts and materials. The other building's primary industrial activities include final product shipping, a machine shop for wheels and hand forging, hydraulic forging, and storage of parts and materials.

105.   Coastkeeper is informed and believes, and thereon alleges, that many of the Warner Facility areas described herein lack adequate cover or secondary containment, and certain industrial activities occur outside without adequate cover or secondary containment, resulting in discharges of polluted storm water. Scrap metal, active and inactive industrial equipment, raw materials and finished product are stored outdoors and impact storm water runoff.

106.   Coastkeeper is informed and believes, and thereon alleges that O&G, ammonia, metal particulates, particulates of chemically polluted sand and dust have been and continue to be tracked from the manufacturing buildings, raw material and refuse storage areas, parking areas, and equipment maintenance and washing areas throughout the Warner Facility.

107.   Coastkeeper is informed and believes, and thereon alleges that numerous pollutants accumulate on the roofs of the Susan Facility due to emissions from the Susan

Facility.

108.   Coastkeeper is informed and believes, and thereon alleges that these pollutants accumulate near parking, and loading and unloading areas, and the driveways leading into the Warner Facility.

109.   Vehicle and other traffic at the Warner Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris offsite and into waters of the United States.

**B.     The Susan Facility Site Description**

110.   Coastkeeper is informed and believes, and thereon alleges, that the Susan Facility is located near the intersection of South Susan Street and West Central Ave, in Santa Ana, California 92704 and includes six buildings with the following addresses and parcel numbers: 2621 South Susan Street (APN 414-111-12); 2631 S. Susan Street (APN 414-121-01); 3209 W. Central Ave (APN 414-111-04); 3210 W. Central Ave (APN 414-111-12); 3132 W. Central Ave (APN 414-111-11); 3151 W. Adams Street (APN 414-121-10); all in Santa Ana, California 92704.

111.   The Susan Facility is classified as conforming to SIC code 3463 (Fabricated Metal Products).

112.   Coastkeeper is informed and believes, and thereon alleges, that the Susan Facility site is identified in the April 2018 SWPPP submitted to the Regional Board ("Susan 2018 SWPPP") as approximately five (5) acres in size.

113.   Coastkeeper is informed and believes, and thereon alleges, that the Susan Facility is comprised of and contains, among other areas and materials, buildings purposed for several activities, including offices, a die shop, maintenance and machine shops, oil and chemical drum storage locations, and buildings or areas for burnishing operations, etching, pressing, heat treating and zyglo die penetrant. Used oil, oily water, coolants, solvents, acids, used lubricants, and scrap metals are pollutant used in, and byproducts of, these industrial processes.

114.   Coastkeeper is informed and believes, and thereon alleges, that many of the Susan Facility areas described herein lack adequate cover or secondary containment, and certain industrial activities occur outside without adequate cover or secondary containment, resulting in discharges of polluted storm water. Scrap metal, active and inactive industrial equipment, raw materials and finished product are stored outdoors and impact storm water runoff.

115.   Coastkeeper is informed and believes, and thereon alleges that O&G, ammonia, metal particulates, particulates of chemically polluted sand and dust have been and continue to be tracked from the manufacturing buildings, raw material and refuse storage areas, parking areas, and equipment maintenance and washing areas throughout the Susan Facility.

116.   Coastkeeper is informed and believes, and thereon alleges that numerous pollutants accumulate on the roofs of the Susan Facility due to emissions from the Susan Facility.

117.   Coastkeeper is informed and believes, and thereon alleges that these pollutants accumulate near parking, and loading and unloading areas, and the driveways leading into the Susan Facility.

118.   Vehicle and other traffic at the Susan Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris offsite and into waters of the United States.

**C.     The Aluminum Precision Facilities Storm Water Permit Coverage**

119.   Coastkeeper is informed and believes, and thereon alleges, that Aluminum Precision first submitted an NOI for its industrial operations at the Warner Facility in or around April 1992. Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators submitted a NOI for the Warner Facility on or about March 17, 2015 ("2015 Warner NOI"), for coverage under the 2015 Permit.

120.   The 2015 Warner NOI lists the Warner Facility operator as "Aluminum Precision Products" and the Warner Facility address as "3333 W. Warner Ave, Santa Ana, CA 92704."

121.   The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Warner Facility Waste Discharger Identification ("WDID") number as 8 30I015996.

122.   SMARTS lists the Warner Facility's coverage under the Storm Water Permit as "Active."

123.   Information available to Coastkeeper indicates that the 2015 Warner NOI lists the SIC code for the Warner Facility as 3463 (Nonferrous Forgings).

124.   Coastkeeper is informed and believes, and thereon alleges, that Aluminum Precision Company first submitted a NOI for its industrial operations at the Susan Facility in or around April 1992.

125.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators submitted a NOI for the Susan Facility on or about March 17, 2015 ("2015 Susan NOI"), for coverage under the 2015 Permit.

126.   The 2015 Susan NOI lists the Susan Facility operator as "Aluminum Precision Products" and the Susan Facility address as "2621 S. Susan Street, Santa Ana, CA 92704."

127.   SMARTS lists the current Susan Facility Waste Discharge Identification ("WDID") number as 8 30I002610.

128.   SMARTS lists the Susan Facility's coverage under the Storm Water Permit as "Active."

129.   Information available to Coastkeeper indicates that the 2015 Susan NOI lists the SIC codes for the Susan Facility as 3463 (Nonferrous Forgings).

130.   Coastkeeper is informed and believes, and thereon alleges, that the 2015 Susan NOI and the 2015 Warner NOI each identify the receiving water for runoff from

1   the Aluminum Precision Facilities to be the Pacific Ocean.

2       131.   Via search of the SMARTS database, Coastkeeper obtained a SWPPP for

3   the Warner Facility dated April 2018 ("Warner 2018 SWPPP").

4       132.   Via search of the SMARTS database, Coastkeeper obtained a SWPPP for

5   the Susan Facility dated April 2018 ("Susan 2018 SWPPP").

6       133.   Coastkeeper is informed and believes, and thereon alleges, that the

7   Aluminum Precision Facilities' SWPPPs fail to describe and/or adequately describe all of

8   the Aluminum Precision Facilities industrial activities or processes.

9       134.   Coastkeeper is informed and believes, and thereon alleges, that because the

10  Aluminum Precision Facilities' SWPPPs fail to describe and/or adequately describe all of

11  the Aluminum Precision Facilities' industrial activities, the SWPPPs also fail to describe

12  and/or adequately describe all of the significant materials and processes that are related to

13  the Facilities' industrial activities.

14      135.   Coastkeeper is informed and believes, and thereon alleges, that without

15  properly identifying all industrial activities or all significant materials at the Facility in

16  the SWPPPs, the Aluminum Precision Facilities Owners and/or Operators have not

17  developed and/or implemented all appropriate BMPs.

18      136.   Coastkeeper is informed and believes, and thereon alleges, that the

19  Aluminum Precision Facilities' SWPPPs include no assessment and/or no adequate

20  assessment of potential pollutant sources, the associated pollutants, and the corresponding

21  BMPs at the Aluminum Precision Facilities.

22      137.   Coastkeeper is informed and believes, and thereon alleges, that the

23  Aluminum Precision Facilities' SWPPPs include no description and/or no adequate

24  description of the Facility BMPs, analysis of the effectiveness of the BMPs, or a

25  summary of the BMPs by pollutant source.

26      138.   Coastkeeper is informed and believes, and thereupon alleges, that Aluminum

27  Precision Owners and/or Operators have failed and continue to fail to develop the

28  Aluminum Precision Facilities' SWPPPs and site-specific BMPs consistent with Section

A of the 1997 Permit and Section X of the 2015 Permit.

139.   Coastkeeper is informed and believes, and thereon alleges, that Defendant's SWPPPs fail and continue to fail to include an adequate: (1) list of significant materials handled and stored at the site; (2) description of potential pollutant sources including industrial processes, material handling and stockpiling areas, and dust and particulate generating activities; (3) description of significant spills and leaks; or (4) list of all non-storm water discharges and their sources. Section A of the 1997 Permit and Section X of the 2015 Permit.

140.   Coastkeeper is informed and believes, and thereon alleges, that pollutants associated with the Aluminum Precision Facilities include, but are not limited to: pH-affecting substances; metals, such as iron, magnesium and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, arsenic, silver, nickel, copper, and mercury; volatile organic compounds; ammonia, chemical oxygen demand ("COD"); TSS; gasoline and diesel fuels; fugitive metal particulates, and other dust and dirt; and O&G.

### D.   Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Aluminum Precision Facilities

141.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities are industrial manufacturing facilities that produce fasteners and other parts and equipment used primarily in the aerospace industry. The Aluminum Facilities operate twenty-four (24) hours per day Monday through Thursday. The Warner Facility also operates eight (8) hours per day Friday and Saturday 7:30 A.M. through 3:30 P.M, and the Susan Facility operates eighteen (18) hours per day Friday and Saturday 5:00 A.M. through 11:00 P.M. Industrial, metallic manufacturing often includes powder metallurgy, metal mold casting, joining, smelting, and other industrial requirements and processes. Oil and other lubricants and liquids are key components in these processes.

142.   Coastkeeper is informed and believes, and thereon alleges, that industrial activities that occur at the Aluminum Precision Facilities include burnishing, etching,

pressing, heat treating, zyglo die penetrant, dieing, maintenance of equipment, machining operations and hand forging, hydraulic forging, cooling and storage of work-in-progress and finished parts, storage and onsite transport of raw materials, waste materials and hazardous wastes, and shipping of products, among other industrial activities. Oils and used lubricants of varying types, oily water, coolants, solvents, acids, and scrap metal are pollutants used in, and byproducts of, these industrial processes. Much of this activity results in metal particulates and other portions of scrap metal requiring additional containment and cleanup efforts which Coastkeeper alleges that the Owners and/or Operators Aluminum Precision Facilities have not undertaken.

143.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators store hazardous materials at the Aluminum Precision Facilities such as oils, cleaning solvents and other process chemicals, diesel and other fuels, scrap metal, antifreeze, degreasers, and wastewater.

144.   Information available to Coastkeeper indicates that the Aluminum Precision Facilities' industrial activities include hazardous waste treatment, storage, and disposal, with chemical and oil drums stored inside and outside at both Aluminum Precision Facilities, and hazardous waste generated, treated, and then routinely disposed.

145.   Information available to Coastkeeper in EPA's Resource Conservation and Recovery Act ("RCRA") database indicates that Aluminum Precision is enrolled under the RCRA hazardous waste permitting program and is classified as a "Large Quantity Generator" at the Susan Facility.[5]

146.   Coastkeeper is informed and believes, and thereon alleges, that storm water sampling at the Aluminum Precision Facilities demonstrate that the Aluminum Precision Facilities' storm water discharges contain concentrations of pollutants above the Benchmark Levels, including but not limited to zinc, aluminum, iron, N+N, magnesium,

---

[5] https://ofmpub.epa.gov/enviro/rcrainfoquery_3.facility_information?pgm_sys_id=CAD981449192

TSS, and copper.

147.   Coastkeeper is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmarks demonstrate that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Aluminum Precision Facilities.

148.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to adequately revise the SWPPPs, despite repeated and significant concentrations of pollutants in the Aluminum Precision Facilities' storm water discharges, make changes to the Aluminum Precision Facilities' training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

149.   Coastkeeper is informed and believes, and thereon alleges, that some of the Aluminum Precision Facilities' industrial operations are conducted outdoors without secondary containment or other measures to prevent polluted storm water from discharging from the Aluminum Precision Facilities.

150.   Coastkeeper is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Aluminum Precision Facilities' operations areas and offsite.

151.   Coastkeeper is informed and believes, and thereon alleges, that these pollutants accumulate at the bulk material or waste stockpiling and storage areas, the loading and unloading areas, and the parking lots and the driveways.

152.   Coastkeeper is informed and believes, and thereon alleges, that these pollutants are subsequently deposited into storm drains adjacent to the Aluminum Precision Facilities via storm water, fugitive dust and other means, including but not limited to dust generated by wind, equipment and vehicles.

153.   Coastkeeper is informed and believes, and thereon alleges, that trucks and vehicles leaving the Aluminum Precision Facilities via staging areas and driveways are

pollutant sources tracking sediment, dirt, oil and grease, metal particulates, and other pollutants off-site.

154. Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners' and/or Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with their industrial activities to precipitation, and that this results in discharges of polluted storm water from the Aluminum Precision Facilities and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

155. Coastkeeper is informed and believes, and thereon alleges, that BAT/BCT for the Aluminum Precision Facilities is full enclosure of all uncovered bulk material stockpiles, finished and other product, hazardous waste generation, storage and treatment areas, industrial operation that cause the spread and release of pollutants, and areas for storage of broken, unused, or legacy equipment.

156. Coastkeeper is informed and believes, and thereon alleges, that Defendant has failed to achieve compliance with BAT/BCT requirements by failing to fully enclose bulk material stockpiles, hazardous waste generation, storage and treatment areas, industrial operation areas that cause the spread and release of pollutants, and storage areas for broken, unused and legacy equipment at the Aluminum Precision Facilities.

157. Coastkeeper is informed and believes, and thereon alleges, that Defendant's industrial activities cause polluted exhaust and particulates to be discharged through vents and exhaust, and cooling systems at the Aluminum Precision Facilities, some of which eventually settles into polluted dirt, grime, and dust on the roof surfaces.

158. Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owner's and/or Operator's failure to properly address these pollutants and their sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from the Aluminum Precision Facilities into the Greenville Banning Channel, to the Santa Ana River, which empties into the estuary and Pacific Ocean at Huntington Beach State Park.

159.   Coastkeeper is informed and believes, and thereon alleges, that Defendant's failure to properly address these pollutants and their sources results in the discharge of fugitive dust, including but not limited to dust generated by industrial operations, emissions, exhaust, wind, equipment, and vehicles, which carries these pollutants to off-site waterbodies, properties, streets and storm drains adjacent to the Aluminum Precision Facilities. Pollutants deposited on off-site are then discharged with storm water and eventually flow into Greenville Banning Channel, Santa Ana River, and the estuary and Pacific Ocean at Huntington Beach State Park.

### E.   Storm Water Discharges at the Aluminum Precision Facilities

#### 1.   The Susan Facility

160.   The Aluminum Precision Facilities Owners and/or Operators report that there are seven (7) discharge points at the Susan Facility, which accept storm water flowing in various directions from onsite industrial areas and discharge storm water offsite: Outfall 1 is on the 3029 West Central property adjacent to South Susan. Outfall 2 is on the same property next to the parking lot, near to West Central. Outfall 3 is located on the 3210 West Central property between the two parking lots. Outfall 4 is between the 3210 West Central building and the 2621 South Susan building near South Susan. Outfall 5 is south of the 2621 South Susan building. Outfall 6 is between the buildings at 3151 West Adams and 2631 South Susan in the parking lot. And Outfall 7 is near the corner of South Susan Street and West Adams on the 2631 South Susan property.

161.   Storm water at the Susan Facility flows to these outfalls from various areas on the properties, which include, but are not limited to, the roofs, oil and chemical drum storage locations, and multiple parking areas. Storm water exiting the Susan Facility flows west from West Central and West Adams and drains to South Susan. From there, the storm water flows near to the intersection with Segerstrom Street where it enters the Santa Ana Municipal Separate Storm Sewer System ("MS4"). The MS4

162.   Upon information and belief, discharges of storm water from include but are not limited to storm water flowing through loading and unloading areas, an oil and

chemical drum storage area, an exposed die storage area, drums, pallets, casts, and scrap metal, and hazardous waste storage area.

163.   The Susan Facility SWPPP does not identify down spouts from the roofed areas of the manufacturing buildings; it is unknown which discharge points handle storm water runoff originating from roofed areas, where exhaust carrying various pollutants is discharged through vents and exhaust systems and settles and accumulates as polluted dirt, grime, and dust on the roof surfaces.

### 2.  The Warner Facility

164.   The Aluminum Precision Facilities Owners and/or Operators report that there are five (5) discharge points at the Warner Facility which discharge storm water flowing in various directions from onsite industrial areas offsite: four of these are described as driveways onto Warner Avenue and South Yale Street and from there the storm water enters the Santa Ana MS4. The following information is taken from the Warner Facility SWPPP and site map. Outfall 1 is on the 3333 Warner Avenue property adjacent to South Yale Street. Storm water from Outfall 1 flows onto South Yale Street from a driveway. Outfall 2 is on the 3333 South next to a parking lot, near to West Warner Avenue. Storm water from Outfall 2 is sampled in the lot prior to flowing onto West Warner Avenue from a driveway. Outfall 3 is located on the 3323 Warner Avenue property between two parking lots. Storm water from Outfall 3 is sampled in the driveway prior to flowing onto West Warner Avenue from a driveway. Outfall 4 is on the 3323 Warner Avenue property adjacent to the eastern border of the property. Storm water from Outfall 4 is sampled in a driveway near the eastern border of the property and is believed to discharge from the eastern border of the site and the southern border of the site onto West Warner Avenue. Outfall 5 is near Outfall 1 on the 3333 Warner Avenue property along South Yale Street.

165.   Upon information and belief, before discharging from the Warner Facility, storm water flows through and from areas on the property, including but not limited to, the roofs, oil and chemical drum storage locations, multiple parking areas, loading and

unloading areas, scrap metal refuse areas, active and inactive industrial equipment areas, raw material storage areas, and areas for storing finished and work-in progress products stored outdoors.

166.   The Warner Facility SWPPP does not identify down spouts from the roofed areas of the manufacturing buildings; it is unknown which discharge points handle storm water runoff originating from roofed areas, where exhaust carrying various pollutants is discharged through vents and exhaust systems and settles and accumulates as polluted dirt, grime, and dust on the roof surfaces.

**F.   The Aluminum Precision Facilities' Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

167.   Coastkeeper is informed and believes, and thereon alleges, that pollutants from the Aluminum Precision Facilities discharge from at least twelve (12) discharge points to the Santa Ana MS4, which discharges to Greenville Banning Channel, which empties to the Santa Ana River, which drains to the estuary and Pacific Ocean at Huntington Beach State Park (collectively the "Receiving Waters").

168.   The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

169.   Coastkeeper is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States, and/or a tributary to a traditionally navigable water.

170.   Coastkeeper is informed and believes, and thereon alleges, that polluted storm water and discharges from the Aluminum Precision Facilities to the Receiving Waters.

171.   Samples of storm water discharges collected at the Aluminum Precision Facilities contain pollutants including aluminum, copper, iron, magnesium, N+N, pH affecting substances, TSS, and zinc, in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

172.   Coastkeeper is informed and believes, and thereon alleges, that during and/or after every significant rain event[6] or any other storm water discharge that has occurred at the Aluminum Precision Facilities since February 22, 2014, through the present, Defendant has discharged and continues to discharge storm water from the Aluminum Precision Facilities that contains pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, EPA Benchmarks, CTR, and the WQS.

### G.   Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements

173.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to develop an adequate M&RP for industrial operations at the Aluminum Precision Facilities that complies with Section B(2)(d) of the 1997 Permit, and Section XI of the 2105 Permit.

174.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to revise the M&RP for the Aluminum Precision Facilities as necessary to ensure compliance with the 1997 Permit, in violation of Section B(5)(a) of the 1997 Permit, and Section XI(B) of the 2105 Permit.

---

[6] A significant rain event is an event that produces storm water runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

Complaint for Declaratory and Injunctive Relief   34
and Civil Penalties

175.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to collect samples during the first hour of the first storm event of the Wet Season over the past five years, in violation of Section B(5)(a) of the 1997 Permit and Section XI(B) of the 2015 Permit.

176.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to analyze storm water samples collected at the Aluminum Precision Facilities for all toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharges, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

177.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to demonstrate that storm water sampling limited to those listed in the Aluminum Precision Facilities' SWPPPs, are representative of pollutants from the Aluminum Precision Facilities, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

178.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to sample storm water discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

179.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to adequately revise the M&RP for the Aluminum Precision Facilities as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

180.   Coastkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Aluminum Precision Facilities consistently fail to perform visual observations of storm water during QSEs.

181.   Coastkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Aluminum Precision Facilities have consistently failed and

continue to fail to report noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

182.   Coastkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Aluminum Precisions Facilities have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, 2) an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, 3) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and 4) the date(s) of the Annual Evaluation as required by Section XVI of the 2015 Permit.

183.   Coastkeeper is informed and believes, and thereon alleges, that Defendant's certifications of compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual Reports were in fact submitted, were erroneous because Defendant has not developed and/or implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the 1997 Permit and Sections X and XI of the 2015 Permit.

184.   Coastkeeper is informed and believes, and thereon alleges, that the Owners and/or Operators of the Aluminum Precision Facilities consistently fail to collect storm water samples during QSEs. For example, only thee (2) QSEs were sampled in the 2017-18 reporting year despite seven (7) rain events of greater than 0.1 inch of rain in the first three months of 2018, as reported at the Santa Ana Airport. Five of those rain events were at least 48 hours apart.

185.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed to submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit and Section XVI of the 2015 Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

186.   Coastkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

187.   Coastkeeper is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Aluminum Precision Facilities from discharging from the Aluminum Precision Facilities through the implementation of BMPs that achieve BAT/BCT.

188.   Coastkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Aluminum Precision Facilities occur every time storm water discharges from the Aluminum Precision Facilities. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Aluminum Precision Facilities is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

189.   Defendant violates and will continues to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Aluminum Precision Facilities.

190.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners' and/or Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

191.   Each day since at least February 22, 2014 that Aluminum Precision Facilities Owners and/or Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

192.   By committing the acts and omissions alleged above, the Aluminum Precision Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

193.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Coastkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

194.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

195.   Coastkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

196.   Coastkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Aluminum Precision Facilities occur each time storm water discharges from the Aluminum Precision Facilities.

197.   Coastkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Aluminum Precision Facilities each time storm water discharges from the Aluminum Precision Facilities.

198.   The Aluminum Precision Facilities Owners and/or Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Aluminum Precision Facilities.

199.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

200.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

201.   By committing the acts and omissions alleged above, the Aluminum Precision Facilities Owners and/or Operators is subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

202.   An action for injunctive relief under the CWA is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Coastkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

203.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**THIRD CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

204.    Coastkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

205.    Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to develop an adequate SWPPP for the Aluminum Precision Facilities, in violation of the Storm Water Permit.

206.    Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to adequately implement a SWPPP for the Aluminum Precision Facilities, in violation of the Storm Water Permit.

207.    Coastkeeper is informed and believes, and thereon alleges, that Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to adequately revise a SWPPP for the Aluminum Precision Facilities, in violation of the Storm Water Permit.

208.    The Aluminum Precision Facilities Owners and/or Operators have been in violation of the Storm Water Permit at the Aluminum Precision Facilities every day from February 22, 2014 to the present.

209.    The Aluminum Precision Facilities Owners' and/or Operators' violations of the Storm Water Permit and the CWA at the Aluminum Precision Facilities are ongoing and continuous.

210.    The Aluminum Precision Facilities Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Aluminum Precision Facilities Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the Aluminum Precision Facilities.

211.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Aluminum Precision Facilities is a separate and distinct violation of the CWA.

212.   By committing the acts and omissions alleged above, the Aluminum Precision Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

213.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Coastkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

214.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

215.   Coastkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

216.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to develop an adequate M&RP for the Aluminum Precision Facilities, in violation of the Storm Water Permit.

217.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail

to adequately implement an M&RP for the Aluminum Precision Facilities, in violation of the Storm Water Permit.

218.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to adequately revise an M&RP for the Aluminum Precision Facilities, in violation of the Storm Water Permit.

219.   The Aluminum Precision Facilities Owners and/or Operators have been in violation of the Storm Water Permit's monitoring requirements at the Aluminum Precision Facilities every day from February 22, 2014 to the present.

220.   The Aluminum Precision Facilities Owners' and/or Operators' violations of their Storm Water Permit's monitoring requirements and the CWA at the Aluminum Precision Facilities are ongoing and continuous.

221.   The Aluminum Precision Facilities Owners and/or Operators will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Aluminum Precision Facilities.

222.   Each and every violation of the Storm Water Permit's M&RP requirements at the Aluminum Precision Facilities is a separate and distinct violation of the CWA.

223.   By committing the acts and omissions alleged above, the Aluminum Precision Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

224.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Coastkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

225.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

226.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

227.   Receiving Water Limitation C(3) of the 1997 Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to current BMPs in order to prevent or reduce any pollutant in storm water discharges that are causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, those BMPs must be implemented into the Facility's SWPPP.

228.   Receiving Water Limitation C(4)(a) of the 1997 Permit requires the report to be submitted to the Regional Board no later than 60-days from the date the discharger first learns its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.

229.   Section XII(C) of the 2015 Permit requires a discharger to execute a Level 1 Exceedance Response Actions ("ERA") Evaluation and prepare a Level 1 ERA Report should they exceed a Numeric Action Level ("NAL") for any required sampling and analysis parameter under the 2015 Permit, or a Level 2 ERA and prepare a Level 2 ERA Report should they exceed a NAL for two consecutive two consecutive reporting years, for any required sampling and analysis parameter under the 2015 Permit The ERA Evaluation should identify additional BMPs and SWPPP revisions needed to prevent future NAL exceedances and comply with the 2015 Permit. Based upon the ERA

Evaluation(s), the discharger shall as soon as practicable, but not later than January 1, shall submit an ERA Report and certify that the ERA Report includes: 1) a summary of the ERA Evaluation, 2) a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. Level 2 ERA reports require more stringent requirements than a Level 1 ERA report.

230.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

231.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators failed and continue to fail to submit an accurate or complete ERA Reports to the Regional Board for the Aluminum Precision Facilities, in violation of Section XII(C) of the 2015 Permit.

232.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners' and/or Operators' Annual Reports failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

233.   Coastkeeper is informed and believes, and thereon alleges, that the Aluminum Precision Facilities Owners and/or Operators have failed and continue to fail to submit complete Annual Reports to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit and Sections XI and XVI of the 2015 Permit.

234.   The Aluminum Precision Facilities Owners and/or Operators have been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least February 22, 2014, and  Sections XI, XII and XVI of the 2015 Permit since July 1, 2015.

235.   The Aluminum Precision Facilities Owners and/or Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has

operated the Aluminum Precision Facilities without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit, and Sections XI, XII(C) and XVI of the 2015 Permit.

236.   The Aluminum Precision Facilities Owners and/or Operators have been in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit every day since at least February 22, 2014, and Sections XI, XII(C) and XVI of the 2015 Permit since at July 1, 2015.

237.   The Aluminum Precision Facilities Owners' and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

238.   By committing the acts and omissions alleged above, the Aluminum Precision Facilities Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 22, 2014 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

239.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Coastkeeper, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

240.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VII.    RELIEF REQUESTED

241.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for their unlawful discharges of pollutants from the Aluminum Precision Facilities in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.      A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015 and assessed on or after January 15, 2018 subjects Aluminum Precision to a penalty of up to $53,484 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

e.      A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

1     f.  Any other relief as this Court may deem appropriate.

2

3 Dated: April 24, 2019      Respectfully submitted,

4

5

6

7               Anthony M. Barnes

8               AQUA TERRA AERIS LAW GROUP

               Attorneys for Plaintiff

9               Orange County Coastkeeper

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief   47
and Civil Penalties

# EXHIBIT A



February 21, 2019

**<u>VIA CERTIFIED MAIL – Return Receipt Requested</u>**

Gregory S. Keeler                          Ron Awrey
Chief Executive Officer                    Plant Engineer
Aluminum Precision Products, Inc.          Aluminum Precision Products, Inc.
3333 W. Warner Ave                         3333 W. Warner Ave
Santa Ana, CA 92704                        Santa Ana, CA 92704

Roark L. Keeler
Registered Agent for Service of Process
Aluminum Precision Products, Inc.
3333 W. Warner Ave
Santa Ana, CA 92704

**Re:     Notice of Violation and Intent to File Suit Under the Clean Water Act**

To Whom It May Concern:

We writing on behalf of Orange County Coastkeeper ("Coastkeeper") regarding violations of the Clean Water Act[1] and California's Industrial Storm Water Permit[2] ("Storm Water Permit") occurring at the Aluminum Precision Products, Inc. ("Aluminum Precision") facility located at 3323 Warner Avenue and 3333 Warner Avenue, Santa Ana, CA 92704 (the "Warner Avenue Facility" or "Facility").[3] Aluminum Precision is a California Corporation headquartered in Santa Ana, where two additional Aluminum Precision Facilities are also located. The purpose of this letter is to put Aluminum Precision, as the owners and operators[4] of the Warner Avenue Facility, on notice of the violations of the Storm Water Permit and the Clean Water Act occurring at the Warner Avenue Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Aluminum Precision is liable for violations of the Storm Water Permit and the Clean Water Act relating to the Warner Avenue Facility.

Section 505 of the Clean Water Act allows citizens to bring suit in federal court against facilities alleged to be in violation of the Clean Water Act and/or related Permits. Section 505 of the Clean Water Act allows citizens to bring suit in federal court against facilities alleged to be in

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ, as amended by Order No. 2015-0057-DWQ.
[3] The Facility is comprised of two large buildings and one small storage building at 3323 and 3333 Warner Avenue, Santa Ana, CA 92704.
[4] The owners and/or operators of the Facility are identified in Section I (B) below and referred to hereinafter as the "the Facility Owners and/or Operators" or "Owners and/or Operators."



violation of the Clean Water Act and/or related permits. Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This letter is being sent to you as the responsible owners and/or operators of the Warner Avenue Facility, or as the registered agent for this entity. This notice letter ("Notice Letter") is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Aluminum Precision that Coastkeeper intends to file a federal enforcement action against Aluminum Precision for violations of the Storm Water Permit and the Clean Water Act at the Warner Avenue Facility sixty (60) days from the date of this Notice Letter.

This letter constitutes notice of Coastkeeper's intent to sue Aluminum Precision for violations of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342, and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("Storm Water Permit"), Water Quality Order No. 97-03-DWQ ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ ("2015 Permit ") (collectively "Storm Water Permit"), and recently amended but not yet adopted Order No. 20XX-XXX-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use. ("2018 Permit"). The 1997 Permit was in effect between 1997 and June 30, 2015, and the 2015 Permit went into effect on July 1, 2015. As explained below, the 2015 Permit includes many of the same fundamental requirements, and implements many of the same statutory requirements, as the 1997 Permit. Violations of these requirements constitute ongoing violations for purposes of Clean Water Act enforcement.

## I.   BACKGROUND

### A.   <u>Orange County Coastkeeper</u>

Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626. Coastkeeper has over 6,000 members who live and/or recreate in and around the Santa Ana River, Huntington Beach State Park, and greater Santa Ana River Watershed. Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

Members of Coastkeeper live and own homes in the Santa Ana River Watershed, and use and enjoy the waters to which the Warner Avenue Facility discharges storm water, including the Santa Ana River and the Pacific Ocean, to participate in a variety of water sports and other



activities, to view wildlife, recreate, and engage in scientific studies including monitoring activities. The discharge of pollutants from the Warner Avenue Facility impairs each of these uses. These discharges of polluted storm water from the Warner Avenue Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Aluminum Precisions' failure to comply with the Clean Water Act and the Storm Water Permit at the Warner Avenue Facility.

**B.     The Owners and/or Operators of the Aluminum Precision Facility**

Aluminum Precision is currently an active California Corporation with California entity number C0497022. The listed registered agent for service is Roark L. Keeler, 3333 W. Warner Ave, Santa Ana, CA 92704. The registered California entity lists the entity address with the California Secretary of State as 3333 W. Warner Ave, Santa Ana, CA 92704.

Information available to Coastkeeper indicates that the Facility is comprised of two (2) addresses, 3333 Warner Avenue and 3323 Warner Avenue, with three (3) Assessor's Parcel Number(s) ("APN"): 408-191-04, 408-191-05, and 408-191-06. When Coastkeeper refers to owners and operators herein, those legally responsible for Aluminum Precision are referred to collectively as the Warner Avenue Facility "Owners and/or Operators."

The Warner Avenue Facility Owners and/or Operators have violated and continue to violate the procedural and substantive terms of their Storm Water Permits and the Clean Water Act for the Facility, including, but not limited to, the illegal discharge of pollutants into local surface waters and are liable for violations of the Storm Water Permits and the Clean Water Act.

**C.     The Aluminum Precision Facility's Storm Water Permit Coverage**

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. *See* 2015 Permit, Finding #12. Upon information and belief, Aluminum Precision obtained Storm Water Permit coverage for the Facility on or about April 1, 1992 and obtained coverage under the 1997 Permit on May 21, 1997. On March 17, 2015, Aluminum Precision submitted an NOI for coverage under the 2015 Permit. The Facility NOI identifies the owner/operator of the Warner Avenue Facility as Aluminum Precision, with an address of 3333 W. Warner Ave, Santa Ana, CA 92704.

The NOI lists the Facility site size as 9.8 acres, with one (1) acre of industrial area exposed to storm water. The Waste Discharger Identification ("WDID") number for the Facility is 8 30I015996. The NOI lists the Primary Standard Industrial Classification ("SIC") code for the Facility as 3463 (Nonferrous Forgings). The Storm Water Permit classifies facilities with SIC code 3463 under "Fabricated Metal Products." *See* 2015 Permit §XI(B) Table 1.

3



D.     **Storm Water Pollution and the Waters Receiving the Aluminum Precision Facility's Discharges**

With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations such as the Warner Avenue Facility pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from industrial manufacturing facilities such as the Warner Avenue Facility can contain pH-affecting substances; metals such as iron, magnesium and aluminum; toxic metals such as lead, zinc, nickel, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS"); total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia-N; fuel additives; coolants; antifreeze; nitrate + nitrite nitrogen ("N+N"); trash; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm. Discharges of polluted storm water to the Santa Ana River and Pacific Ocean pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

The Facility discharges into the Santa Ana municipal separate storm sewer system ("MS4") via four driveways on South Yale Street and Warner Avenue. The MS4 drains to the Greenville Banning Channel, which empties to the Santa Ana River, which flows to the Pacific Ocean at Huntington Beach State Park. These bodies of water are collectively referred to herein as the "Receiving Waters." These discharges pose threats as described above and affect the use and enjoyment of these waters sought by members of Coastkeeper.

The Receiving Waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied species, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities. The public's use of local waterways exposes many people to toxic metals and other contaminants in storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

The California Regional Water Quality Control Board, Santa Ana Region Regional Board ("Regional Board") issued the *Santa Ana River Basin Water Quality Control Plan* ("Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for the Santa Ana River include, at a minimum: warm freshwater habitat (WARM); water contact recreation (REC1); non-contact water recreation



(REC2); commercial and sportfishing (COMM); wildlife habitat (WILD); rare, threatened or endangered species (RARE); spawning reproduction and development (SPWN); and marine habitat (MAR). *See* Basin Plan at Table 3-1. The Pacific Ocean from the San Gabriel River to Corona Del Mar also has numerous listed Beneficial Uses including water contact recreation (REC1); non-contact water recreation (REC2); shell fish harvesting (SHEL); commercial and sportfishing (COMM); wildlife habitat (WILD); rare, threatened or endangered species (RARE); spawning reproduction and development (SPWN); and marine habitat (MAR). *Id.*

According to the 2016 303(d) List of Impaired Water Bodies, the Santa Ana River is impaired for Indicator Bacteria.[5] Polluted discharges from industrial sites, such as the Warner Avenue Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife that depends on these waters.

## II.    THE ALUMINUM PRECISION FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A.    <u>The Warner Avenue Facility Site Description and Industrial Activities</u>

The Warner Avenue Facility is located in Santa Ana, CA near the intersection of Warner Avenue and South Yale Street, specifically at the addresses of 3323 and 3333 Warner Avenue, Santa Ana, CA 92704. The Facility's boundaries are Warner Avenue on the south, South Yale Street on the west, and businesses on the north and east.

This Facility is an aluminum forging facility that produces precision parts and components for aerospace and automotive applications including closed die and open ("hand") aluminum forgings. According to the Facility Storm Water Pollution Prevention Plan ("SWPPP") Warner Avenue Facility operates 24 hours per day (Monday through Thursday) and 8 hours per day (Friday and Saturday 7:30 A.M. to 3:30 P.M.). Per the company's website, the company employs approximately 650 people.[6]

Information available to Coastkeeper indicates that the Warner Avenue Facility has two large buildings and one small storage building on contiguous parcels. One building serves as company "headquarters, final product shipping, machine shop, and storage of parts and materials."[7] The other building's primary industrial activities include "final product shipping, machine shop for wheels and hand forging, hydraulic forging, and storage of parts and materials."[8] Oils and used oils of varying types, oily water, coolants, solvents, acids, used lubricants, and scrap metals are pollutant used in, and byproducts of, these industrial processes. Track-out of metal debris, metal and other pollutant particulate, liquids such as coolant, solvent, degreaser, waste oil, oily water by machinery, and vehicle and foot traffic, and other fugitive

---

[5] 2016 Integrated Report – All Assessed Waters, *available at*
*https://www.waterboards.ca.gov/water_issues/programs/tmdl/2014_16state_ir_reports/category5_report.shtml* (last accessed on January 22, 2018).
[6] See *http://www.aluminumprecision.com/about-app/* (last accessed on December 12, 2018).
[7] See SWPPP April 2018, Table 4-1 (p. 5).
[8] *Id.*



emissions at the Facility, impact the storm water and the environment due to a lack of containment. Exhaust from industrial manufacturing and cooling processes and other discharges from industrial activities from the Warner Avenue Facility also impacts storm water. Certain industrial activities and storage occur outside, without adequate cover, containment or other measures, resulting in discharges of polluted storm water. Scrap metal, active and inactive industrial equipment, raw materials and finished product are stored outdoors and impact storm water runoff. Fugitive dust, debris, particulate, exhaust emissions and other pollutants at Facility are also uncontained and enter local waterways via storm water, unauthorized non-storm water discharge and aerial deposition. These industrial activities and contaminant factors create significant sources of pollution at the Facility.

Pollutants associated with operations at the Facility include, but are not limited to: pH-affecting substances; metals such as iron and aluminum; toxic metals such as lead, copper and zinc; TSS; gasoline and diesel fuels; fuel additives; coolants; trash; and nitrate as nitrogen.

Coastkeeper alleges that Aluminum Precision has not properly developed and/or implemented the required best management practices ("BMPs") to address pollutant sources and contaminated discharges. BMPs are necessary at the Warner Avenue Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events. Consequently, during rain events storm water carries pollutants from the Facility's raw and finished material, oil, and chemical storage areas, parking areas, fueling and maintenance areas, loading and unloading areas, garbage and refuse storage areas, scrap metal areas, equipment washing areas, and other areas into the municipal separate storm sewer system, which flows into the Receiving Waters, in violation of the Storm Water Permit.

Information available to Coastkeeper indicates that metal particulates have been and continue to be tracked from the manufacturing buildings, raw material and refuse storage areas, parking areas, and equipment maintenance and washing areas throughout the Facility. Further, numerous pollutants are believed to accumulate on the roofs of the Facility due to exhaust emissions from furnaces, other industrial heat sources, air conditioners and other heating and air discharge equipment, resulting in polluted storm water and non-storm water discharges from the Facility. In addition to the roofs, these pollutants accumulate in parking, loading and unloading areas, and the driveways of the Facility. As a result, trucks and vehicles leaving the Facility via the driveways are track sediment, dirt, metal particles, and other pollutants off-site.

## B.   The Aluminum Precision Facility's Storm Water Flow and Discharge Locations

Publicly available information indicates that storm water at the Warner Avenue Facility is discharged off site from four (4) discharge points via driveways into Warner Avenue and South Yale Street. From there, the storm water enters the Santa Ana MS4. Outfall 1 is on the 3333 Warner Avenue property adjacent to South Yale Street. Outfall 2 is on the same property next to the parking lot, near to West Warner Avenue. Outfall 3 is located on the 3323 Warner Avenue property between the two parking lots. Outfall 4 is on the 3323 Warner Avenue property adjacent to the eastern border of the property. Outfall 5 is near Outfall 1 on the 3333 Warner Avenue property along South Yale Street.



The Warner Avenue Facility SWPPP does not identify down spouts from the roofed areas of the manufacturing buildings; it is unknown which discharge points handle storm water runoff originating from roofed areas. After storm water enters the drain inlets it flows into the MS4 and is discharged to the Greenville Banning Channel and into the Santa Ana River.

Coastkeeper obtained information indicating that machinery, equipment finished and unfinished product, and industrial and raw materials are stored outdoors at the Warner Avenue Facility. Pallets, metal tubes and rolls, scrap metal and casts are lined and stacked in outdoor areas of the Facility without adequate secondary containment. Uncovered scrap bins contain scrap wood and metal. These industrial materials are uncovered, stored on the ground, and exposed to storm water. Information available to Coastkeeper also indicates that the Facility has large air conditioning and cooling units that may lead to non-storm water discharges.

## III.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMITS

The Clean Water Act requires that any person discharging pollutants to a water of the United States from a point source[9] obtain coverage under an NPDES permit. *See* 33 U.S.C. §§ 1311(a), 1342; 40 CFR § 122.117(c)(1). CWA § 402 further requires each discharger to meet minimum technology-based treatment requirements. Discharges of toxic pollutants must be treated pursuant to the best available technology ("BAT"), 33 U.S.C. § 1311 (b)(2)(A), and other pollutant discharges must comply with best conventional technology ("BCT"). 33 U.S.C. § 1311(b)(2)(E).

In addition to implementing technology-based controls, each point source discharger must achieve "any more stringent limitation necessary to meet water quality standards[.]" 33 U.S.C. § 1311(b)(1)(C). Water quality standards establish the water quality goals for a water body. 40 C.F.R. § 131.2. They serve as the regulatory basis for the establishment of water quality-based controls over point sources, as required under § 301 and § 306 of the CWA. Once water quality standards are established for a particular water body, any NPDES permit authorizing discharges of pollutants into that water body must ensure that the applicable water quality standard will be met. 33 U.S.C. § 1311(b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

The 1997 Permit requires dischargers meet all applicable provisions of Sections 301 and 402 of the CWA. Rather than requiring specific application of BAT and BCT techniques to each storm water discharge, compliance with the terms and conditions of the 1997 Permit served as a proxy for meeting the BAT/BCT mandate. *See* 1997 Permit, Finding 10. Conversely, failure to comply with the terms and conditions of the 1997 Permit constitutes failure to subject discharges to BAT/BCT, and is a violation of the CWA.

---

[9] A point source is defined as any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2



The 2015 Permit includes the same fundamental terms as the 1997 Permit. For purposes of this Notice Letter, Coastkeeper refers to the reissued permit as the "2015 Permit." The 2015 Permit retains this core statutory requirement to meet BAT/BCT standards. Just like the 1997 Permit, the 2015 Permit requires all facility operators to develop and implement SWPPP that includes BMPs, although the 2015 Permit now requires operators to implement certain minimum BMPs, as well as advanced BMPs as necessary, to achieve compliance with the effluent and receiving water limitations of the 2015 Permit. Advanced BMP categories are defined as follows: (1) exposure minimization BMPs, (2) storm water containment and discharge reduction BMPs, (3) treatment control BMPs, and (4) additional advanced BMPs needed to meet the effluent limitations of the 2015 Permit. Coastkeeper alleges that Warner Avenue Facility Owners and/or Operators have failed to implement advanced BMPs as necessary to meet the effluent limitations of the 2015 Permit, as borne out by the Facility's self-reported storm water sampling results. *See* Exhibit A. The 2015 Permit also requires all facility operators to sample storm water discharges more frequently than the 1997 Permit, and to compare sample and analytical results with numeric action levels ("NALs").

Under the 2015 Permit, facility operators are required to perform Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL exceedances. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year[10] exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. 2015 Permit XII.A. There are two (2) ERA levels, Level 1 and Level 2. If a discharger enters Level 1 for exceedances of any constituent in a reporting year that facility must prepare a Level 1 ERA to adequately address the polluted discharges. Should the facility's sample results average over the annual NAL for a second consecutive year for the same constituent, the facility must prepare a Level 2 ERA requiring further BMPs to address the exceedances. Coastkeeper has reviewed each of the three (3) ERAs submitted by the Owners and/or Operators of the Warner Avenue Facility and alleges that each of the ERAs are inadequate to address pollutant discharges from the Facility, in part due to the lack of implemented advanced BMPs. The ERA submitted in December 2017 includes plans for implementation of two BMPs to address zinc: 1) a plan to steam clean the roofs; and 2) the roofs were to be painted. Despite again averaging over NAL for zinc in the 2017-2018 reporting year, a further ERA was not submitted for the Warner Avenue Facility at end of 2018. However, a Level 1 ERA was submitted in December 2018 for aluminum, iron, N+N, and magnesium. That ERA does not include the self-reported sampling results from January 8, 2018 and thus interprets the zinc average as below the NAL. The results for each constituent sampled on January 8, 2018 were higher on average for each constituent tested. Copper results were consistently above the EPA benchmark adjusted for water hardness.

---

[10] A reporting year encompasses a full calendar year from July 1, through June 30 of the following year.



Industrial activities conducted at the Warner Avenue Facility under SIC code 3463 require Aluminum Precision to obtain Storm Water Permit coverage for the Facility. Both the 1997 Permit and the 2015 Permit generally require facility operators to: (1) submit a Notice of Intent ("NOI") that certifies the type of activity or activities undertaken at the facility and committing the operator to comply with the terms and conditions of the permit; (2) eliminate unauthorized non-storm water discharges; (3) develop and implement a SWPPP; (3) perform monitoring of storm water discharges and authorized non-storm water discharges; and (4) file an Annual Report that summarizes the year's industrial activities and compliance with the Storm Water Permit.

## A.    Applicable Effluent Standards or Limitations

The Storm Water Permit requires all industrial facilities to sample and analyze storm water discharges for the following parameters: pH, total suspended solids ("TSS"), and oil and grease ("O&G"). *See* 1997 Permit, § B(5)(c)(i); 2015 Permit, §§ XI(B)(6)(a), (b). Facilities classified under SIC code 3463 – Nonferrous Forgings – must also sample and analyze samples for zinc ("Zn"), iron ("Fe"), aluminum ("Al"), and nitrate and nitrite nitrogen ("N+N"). *See* 1997 Permit at Table D; 2015 Permit, § VI(B) at Table 1. Indeed, dischargers must also sample for additional parameters identified by the Discharger that are likely to be present under the Facility pollutant source assessment and additional parameters related to receiving waters with 303(d) listed impairments. 2015 Permit, § XI(B). Here, the Warner Avenue Facility did not sample for copper until 2018 and immediately realized effluent limit exceedances resulting in the Facility's entry into Level 1 ERA. A copper test result from January 8, 2018 registered at 0.465 mg/l, over three (3) times the EPA Benchmark adjusted for an expected water-hardness level in the Receiving Water.

The EPA has published "benchmark" levels as numeric thresholds for helping to determine whether a facility discharging industrial storm water has implemented the requisite BAT and BCT mandated by the CWA. (See *United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity*, as modified effective June 4, 2015.[11]) These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish. EPA benchmarks have been established for pollutants discharged by the Facility, and include: TSS—100 mg/L; Zn—0.11 mg/L; Cu—0.0123 mg/L; and pH—6.0-9.0 s.u. However, the Basin Plan contains narrower effluent levels for pH: for bays and estuary waters, pH—7.0-8.6 s.u; for inland surface waters, pH —6.5-8.5 s.u.

The Criteria for Priority Toxic Pollutants in the State of California, or California Toxics Rule ("CTR"), set forth in 40 C.F.R. § 131.38, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. The CTR sets forth lower numeric limits for zinc and other pollutants such as copper (0.010 mg/l) and nickel (0.037) in freshwater surface

---

[11] Available at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf (last accessed on December 12, 2018).



waters with water hardness calculation of 75 mg/L[12]. CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[13] Coastkeeper puts Aluminum Precision on notice that they have violated, and continue to violate the CTR, and by extension the Clean Water Act, for zinc, copper and other constituents each time polluted storm water discharges from the Warner Avenue Facility.

Courts have expressly held that the EPA Benchmarks are relevant objective standards for evaluating whether the best management practices implemented by a permittee achieve effluent limitations. *See* Santa Monica Baykeeper v. Kramer Metals, Inc., 619 F.Supp.2d 914, 924 (C.D. Cal. 2009) (holding that "EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs"). Thus, comparing EPA Benchmarks and NALs to stormwater monitoring data is sufficient to support a good faith allegation of noncompliance with the technology and/or water-quality based effluent limitations in the General Permit: [exceedance] of the benchmark levels is evidence . . . that [Defendant] did not have BMPs that achieve BAT/BCT[;] . . . however, this evidence in and of itself does not establish a violation of [BAT/BCT]. . . . There can be no reasonable dispute that the Benchmarks are relevant to the inquiry as to whether a facility implemented BMPs. Id. at 925 (emphasis added), citing Waterkeepers Northern California v. AG Industrial Mfg., Inc., 375 F.3d 913, 919 n. 5 (9th Cir. 2004).

Thus, storm water sampling results provide well-founded evidence of a failure to comply with the Storm Water Permit's discharge prohibitions, receiving water limitations and effluent limitations. A monitoring report showing "a water sample with pollutant discharges in excess of permit limits is conclusive evidence of a violation . . .. A defendant may not impeach its own publicly filed reports which are submitted under penalty of perjury." San Francisco Baykeeper v. West Bay Sanitary District, 791 F.Supp.2d 719, 755 (N.D. Cal 2011) [cites and quotes omitted]; see also Sierra Club v. Union Oil, 813 F.2d 1480, 1493 (9th Cir. 1988).

The Warner Avenue Facility Owners and/or Operators have self-reported numerous exceedances of relevant standards at least since 2014, including values several orders of magnitude above regulatory limits. *See* Exhibit A. For example EPA Benchmark for magnesium is .064 mg/L. See 2015 Permit, Appendix J, "Calculating Hardness in Receiving Waters for Hardness Dependent Metals."  The average for self-reported testing submitted to the Regional Water Quality Control Board (RWQCB) in 2018, the first year the Warner Facility tested for magnesium, was 1.364 mg/L, over 21 times the EPA Benchmark. The highest result for magnesium at the Facility came on November 29, 2018: 2.56 mg/L a magnitude of 40 times over the Benchmark. *Id.*

---

[12] Exhibit A uses CTR limits with a water hardness calculation of 100 mg/L for zinc, copper and lead.

[13] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18. To compare sample results reported by the Facility with the CTR criteria, Coastkeeper will use the CTR criteria converted to total metal concentrations set forth in the State Board's "Water Quality Goals" database. The formula used to convert the CTR criteria to total metal concentrations is set forth in the CTR at 40 C.F.R. § 131.38(b)(2)(i). The applicable CTR criteria also requires a hardness value.



Thus, Coastkeeper alleges that the Warner Avenue Facility Owners and/or Operators violate the Storm Water Permit by discharging storm water containing pollutants in excess of, or outside the range of, the applicable effluent limitations each time Aluminum Precision discharges storm water from the Facility. *See, e.g.*, Exhibit B. These discharge violations are ongoing and will continue every day the Owners and/or Operators discharge storm water from the Facility that contains concentrations of pollutants in excess of, or outside the range of, the applicable effluent limitations. Coastkeeper will include additional violations as information and data become available. Further, given that these effluent limitation violations are ongoing, and recent test results evidence additional effluent violations, Coastkeeper puts the Owners and/or Operators on notice that Effluent Limitation V.B. of the 2015 Permit is violated each time storm water is discharged from the Facility. Every Facility discharge of polluted storm water in violation of Effluent Limitation B(3) of the Storm Water Permit and Effluent Limitation V.B. of the 2015 Permit is a separate violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 21, 2014.

**B.  Discharges of Polluted Storm Water from the Aluminum Precision Facility in Violation of Storm Water Permit Effluent Limitations**

The Storm Water Permit states that storm water discharges from facilities shall not exceed specified effluent limitations. 1997 Permit, Effluent Limitation B(1); 2015 Permit, Effluent Limitation V.B. Compliance with the effluent limitation guidelines constitutes compliance with best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") for the specified pollutants and must be met to comply with the Storm Water Permit. 1997 Permit, Fact Sheet at VIII; 2015 Permit, Fact Sheet at pp. 15-17.

Certain activities undertaken at the Warner Avenue Facility produce significant risks to water quality, including metal shavings and dust and other scrap metal. The Facility's April 2018 SWPPP indicates in Table 4-3, On-Site Industrial Material Management, that materials present include oils and lubricants, diesel fuel, cutting fluid, spent cutting fluid, cleaning agent, scrap metals, waste chips, and shavings, and sludge. Discharges of storm water from this Facility contain elevated levels of many of the pollutants that the Facility is required to test for, and self-report and include numerous self-reported sampling results over applicable benchmarks. *See* Exhibit A. These exceedances of applicable benchmarks degrade water quality. BAT/BCT standards are intended to reduce pollutants in storm water discharges through required implementation of BMPs, implementation of BMPs that Coastkeeper alleges have been inadequate. Thus far only ineffective advanced BMPs have been implemented at the Warner Avenue Facility pursuant to the Facility ERA, to address a single constituent, zinc. The most recent ERA report from December 2018 contains detailed restatements of permit requirements for ERA reports, but fails to identify any advanced BMPs the facility plans to implement, and only includes a list reciting standard requirements of any SWPPP, without explanation, such as "minimize or prevent material tracking," "observe all outdoor areas associated with industrial activity . . . " and "cover all stored industrial materials that can become readily mobilized by

11



contact with storm water."[14] This ERA is wholly inadequate as it does nothing to address Copper exceedances.

Because manufacturing facilities using metals are likely to discharge storm water runoff that is contaminated, the EPA provides a storm water fact sheet for Primary Metals Facilities. *See* Environmental Protection Agency, *Sector AA: Fabricated Metal Products Manufacturing Facilities* (EPA-833-F-06-042) December 2006 ("Sector AA Fact Sheet").[15] The fact sheet offers facility operators guidance on how to prepare storm water management programs that are appropriate for their facility and operations. Table 1 of the Sector AA Fact Sheet sets forth the EPA chart regarding the various pollutant sources and pollutants that are typically associated with facilities such as the Aluminum Precision Facility. Despite this EPA guidance, the Facility only started testing for copper in 2018, and does not test for cadmium.

### C. Discharges of Polluted Storm Water from the Aluminum Precision Facility in Violation of BAT/BCT

The Storm Water Permit and Clean Water Act require dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT for toxic[16] and non-conventional pollutants and BCT for conventional pollutants.[17] 33 U.S.C. §§ 1311 (b)(2)(A) and (b)(2)(E); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V.A. The Effluent Limitations define application of BAT for TSS and pH as numeric effluent limitations. A discharge of storm water which exceeds the Effluent Limitations is strong evidence of a failure to achieve BAT/BCT. Again, EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards.[18]

Publicly available information shows that the Warner Avenue Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs at the Facility that achieve compliance with the BAT/BCT standards. Consistent with Aluminum Precision's lack of adequate BMPs, the analytical results of storm water sampling at the Facility demonstrates the Owners and/or Operators have failed and continue to fail to implement BAT/BCT. Specifically, analysis of discharges from the Warner Avenue Facility demonstrates that the storm water discharges consistently contain concentrations of pollutants above the Effluent Limitations and EPA Benchmarks. *See, e.g.,* Exhibit A. For example, the EPA Benchmark is .11 mg/L. A storm water sample that Aluminum Precision collected from the Warner Avenue Facility in May 2016

---

[14] *See* APP Warner ERA Level 1 Evaluation Report, December 27, 2018, at 5-6.

[15] Available at: https://www.epa.gov/sites/production/files/2015-10/documents/sector_aa_fabmetal.pdf (last accessed February 14, 2019)

[16] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.

[17] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, TSS, oil and grease, pH, and fecal coliform.

[18] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System,* as modified effective February 26, 2009 ("Multi-Sector Permit") at 136; *see also,* 65 Federal Register 64851 (2000).



exceeded the EPA Benchmark by 13 times with a more recent sample from January of 2018 reading 0.934 mg/L, over 8 times the EPA Benchmark. Testing for zinc from February 2014 through November 2018 shows 56 zinc exceedances of both the EPA Benchmark and the CTR. In total, Coastkeeper identified 146 total exceedances of EPA Benchmarks over the last four and a half reporting years at the Warner Avenue Facility. *See* Exhibit A.

As noted above in Section III(B), with a hardness value for the receiving waters of 75-100 mg/L, the EPA Benchmark for Cu is .0123 mg/L. Testing for Cu between January 2018 through November 2018 shows 14 exceedances of the EPA Benchmark level, one by a magnitude of 3.78. The repeated and significant exceedances of the EPA Benchmark demonstrate that the Warner Avenue Facility Owners and/or Operators have failed to develop and/or implement required BMPs at the Facility that achieve compliance with the BAT/BCT standards.

Publicly available evidence indicates that the Warner Avenue Facility Owners and/or Operators violate the Storm Water Permit and Clean Water Act for failing to develop and/or implement BMPs that achieve BAT/BCT each time Aluminum Precision discharges storm water from the Facility. *See, e.g.*, Exhibit B. These discharge violations are ongoing and continue every time the Warner Avenue Facility discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Coastkeeper will add dates of violation when additional data becomes available, indeed the most recent samples show additional exceedances. Further, the Facility has violated Effluent Limitation B(3) of the 1997 Permit or Effluent Limitation V.A. of the 2015 Permit each time storm water discharged from the Warner Avenue Facility since February 21, 2014, and each discharge represents a distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act over the past five years and continuing until full compliance with the Storm Water Permit is achieved.

## D. Discharges of Polluted Storm Water from the Aluminum Precision Facility in Violation of Receiving Water Limitations

The Storm Water Permit and the CWA prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[19] 33 U.S.C. § 1311 (b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d); 2015 Permit, Receiving Water Limitation VI.A; 1997 Permit, Receiving Water Limitation C(2). Discharges that contain pollutants in excess of an applicable WQS violate these requirements.

The Storm Water Permit also prohibits storm water discharges and unauthorized non-

---

[19] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan.



storm water discharges to surface water that adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Receiving Water Limitation VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of Receiving Water Limitation C(1) of the 1997 Permit, Receiving Water Limitation VI.B. of the 2015 Permit, and the Clean Water Act.

The Receiving Waters may become impaired with pollutants discharging from Facilities like the Warner Avenue Facility. Information available to Coastkeeper indicates that the Warner Avenue Facility's storm water discharges contain elevated concentrations of pollutants, such as copper, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Santa Ana River, and the Pacific Ocean. *See* Exhibit A. These harmful discharges from the Facility are violations of Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI.B. of the 2015 Permit.

Coastkeeper puts the Warner Avenue Facility Owners and/or Operators on notice that Receiving Water Limitation C(1) and/or (2) of the 1997 Permit VI.A. and VI.B. of the 2015 Permit were/are violated with each polluted storm water discharge from the Facility. *See, e.g.*, Exhibit B. These discharge violations are ongoing and continue every time contaminated storm water is discharged in violation of Receiving Water Limitations. Each time discharges of storm water from the Warner Avenue Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation C(1) of the 1997 Permit, Receiving Water Limitation VI.A. of the 2015 Permit VI.A, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation C(2) of the 1997 Permit, Receiving Water Limitation VI.B. of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Coastkeeper will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since February 21, 2014.

### E.   Unauthorized Non-Storm Water Discharges from the Aluminum Precision Facility

The Storm Water Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. 2015 Permit, Discharge Prohibition III.B; 1997 Permit, Discharge Prohibition A(1). Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III.B.

Further, Coastkeeper is informed and believes that unauthorized non-storm water discharges occur at the Warner Avenue Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. As an example, unauthorized non-storm water discharges may occur at the Facility from process water, cooling functions, and/or equipment, vehicle and machinery cleaning activities. Other unauthorized non-storm water



discharges may occur at the Facility from the hazardous materials storage area, where oils solvents, degreasers, and wastewater are stored. The Facility Owners and/or Operators conduct these activities without sufficient BMPs to prevent related non-storm water discharges. Non-storm water discharges resulting from cooling functions and equipment washing are not listed among the authorized non-storm water discharges in the Storm Water Permit and thus are always prohibited.

Coastkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit is violated each time non-storm water is discharged from the Facility. These discharge violations are ongoing and will continue until the Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. Each time the Facility Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition A(1) of the 1997 Permit and Discharge Prohibition III.B. of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 21, 2014.

### F.  Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all requirements of the Storm Water Permit. The objectives of the SWPPP requirement are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from an industrial Facility, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations. To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis, and must be revised as necessary to ensure compliance with the Storm Water Permit. *See* 1997 Permit, §§ A(1)-A(10) and Provision E(2); 2015 Permit, §§ X.A.-C.

Among other requirements, the SWPPP must include: a site map showing the Facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the Facility and its activities; a list of significant materials handled and stored at the site; a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, non-storm water discharges and their sources, and locations where soil erosion may occur; and an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. 1997 Permit §§ A(3)-A(10); 2015 Permit, § X.D.-H.



The Warner Avenue Facility Owners and/or Operators have continuously conducted operations at the Facility with an inadequately developed and/or implemented SWPPP. For example, descriptions of BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective, is inadequate and incomplete, and does not address all the applicable constituents, notwithstanding the Facility's history of noncompliance regarding those constituents. The Owners and/or Operators have failed to properly revise the Facility's SWPPP to ensure compliance with the Storm Water Permit. The Facility's current SWPPP is recent, dated April 2018, yet despite the significant concentrations of pollutants in the Facility's storm water discharges every year since at least the 2015-2016 Wet Season,[20] it does not include sufficiently effective BMPs to eliminate or reduce these pollutants, as required by the 1997 Permit or the 2015 Permit.

The Facility Owners and/or Operators have failed to adequately develop, implement, and/or revise a SWPPP, in violation of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily violation of the Storm Water Permit's SWPPP requirements since at least February 21, 2014. Violations are ongoing, subjecting Aluminum Precision to civil penalties for each past violation of the Clean Water Act with additional violations added when such information is available.

### G.   Failure to Develop and Implement an Adequate Monitoring Plan

Section B(1) and Provision E(3) of the 1997 Permit require Facility Owners and/or Operators to develop and implement an adequate Monitoring and Reporting Program by October 1, 1992, or prior to the commencement of industrial activities at the Facility, that meets all of the requirements of the Storm Water Permit. Section XI of the 2015 requires dischargers to prepare a Monitoring Implementation Plan. The primary objective of the required monitoring is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit, § B(2); 2015 Permit § XI. Monitoring must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*.

Sections B(5) and B(7) of the 1997 and Section XI of the 2015 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged. Under the 1997 Permit, the Facility Owners and/or Operators are required to collect at least two (2) samples from each discharge location at their Facility during the Wet Season. Storm water samples must be analyzed for TSS, pH, total organic carbon or O&G, and other pollutants that are likely to be present in the Facility's discharges in significant quantities, and

---

[20] The Storm Water Permit defines the Wet Season as October 1 – May 30.



pursuant to a facility's SIC code. *See* 1997 Permit, § B(5)(c). Under the 2015 Permit discharges must collect at least two (2) samples from QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs from the second half of each reporting year (January 1 to June 30) (2015 Permit § X.B.3), which must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code. 2015 Permit § X.G.2.

The Owners and/or Operators of the Warner Avenue Facility have conducted operations at the Facility with an inadequately developed, implemented, and/or revised monitoring plan. Upon information and belief, the Facility Owners and/or Operators did not collect samples from sufficient Qualifying Storm Events ("QSE") at the Facility in the 2017-2018 reporting year where only two (2) QSE were sampled despite seven (7) rain events of over .1 inch of rain in the first three months on 2018 recorded at the Santa Ana Airport. Five of those rain events were at least 48 hours apart. *See* Exhibit B.

Additionally, Coastkeeper alleges the Facility Owners and/or Operators failed to provide adequate records, as required by Section B(4) of the 1997 Permit and Section X.A of the 2015 Permit, for the monthly visual observations of storm water discharges. The Storm Water Permit further requires dischargers to document the presence of any floating and suspended material, O&G, discolorations, turbidity, odor and the source of any pollutants. 1997 Permit, § B(4)(c); 2015 Permit § X.2.C. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. Section B(4) of the 1997 Permit and Section X.A of the 2015 Permit.

Thus, Coastkeeper further alleges that the Warner Avenue Facility Owners and/or Operators failed to properly collect samples from an adequate number of QSE in the 2017-2018 reporting year, and conduct, fully document and report the required observations of storm water discharges.

The Warner Avenue Facility Owners' and/or Operators' failure to conduct sampling and monitoring as required by the Storm Water Permit provides sufficient evidence that the Facility's monitoring plan fails to comply with the requirements of Section B and Provision E(3) of the 1997 Permit and Section XI of the 2015 Permit. Every day that operations at the Facility are conducted in violation of the monitoring requirements of the Storm Water Permit is a separate violation of the Storm Water Permit and the Clean Water Act. The Warner Avenue Facility has violated the Storm Water Permit's monitoring requirements each day since at least February 21, 2014, subjecting the Facility Owners and/or Operators to civil penalties for all violations of the Clean Water Act since February 21, 2014. These violations are ongoing.

### H.   Failure to Comply with the Storm Water Permit's Reporting Requirements

Section B(14) of the 1997 Permit and Section XVI of the 2015 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. The Annual Report must include an explanation for incomplete visual observations and sampling results and



an explanation of why a permittee did not implement any activities required by the Storm Water Permit. *See* 1997 Permit § B(13); 2015 Permit, § XVI.

Coastkeeper alleges that the Warner Avenue Facility Owners and/or Operators have failed and continue to fail to submit Annual Reports that comply with the Storm Water Permit reporting requirements. For example, the Facility Owners and/or Operators certified that the SWPPP's BMPs address existing potential pollutant sources, complies with the Storm Water Permit or will be required to achieve compliance. Coastkeeper has information suggesting that these certifications are erroneous. Storm water samples collected from the Facility have consistently contained concentrations of pollutants above Benchmark Levels, demonstrating that the SWPPP's BMPs have never adequately addressed existing potential pollutant sources. Further, the Facility's SWPPP does not include elements required by the Storm Water Permit, such as additional advanced BMPs given the Warner Avenue Facility's industrial activities (metal forging).

Coastkeeper alleges that the Warner Avenue Facility submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of the Storm Water Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Warner Avenue Facility has been in daily and continuous violation of the Storm Water Permit's reporting requirements each day since at least February 21, 2014, subjecting them to civil penalties for such violations over this same time period. These violations are ongoing, and additional violations will be included when such information becomes available, including further violations of the 2015 Permit reporting requirements (*see* 2015 Permit, § XVI.).

## IV.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the Clean Water Act occurring before November 2, 2015 commencing five years prior to the date of this Notice of Violation and Intent to File Suit subjects Aluminum Precision to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects Aluminum Precision to a penalty of up to $53,484 per day. In addition to civil penalties, Coastkeeper will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d) of the Clean Water Act (33 U.S.C. §§ 1365(a), (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Clean Water Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.



## V.     CONCLUSION

Coastkeeper is willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper will file a citizen suit under Section 505(a) of the Clean Water Act for Aluminum Precision's violations of the Storm Water Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper's legal counsel:

> Aqua Terra Aeris Law Group
> Anthony Barnes
> Jason R. Flanders
> amb@atalawgroup.com
> 490 43rd Street, Suite 108
> Oakland, CA 94609
> (415) 326-3173

Sincerely,

Anthony M. Barnes
Jason R. Flanders
ATA Law Group
Counsel for Orange County Coastkeeper



**SERVICE LIST**

<u>VIA U.S. CERTIFIED MAIL – Return Receipt Requested</u>

William Barr
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

Mike Stoker
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Andrew Wheeler
Acting Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Hope Smythe
Executive Officer
Regional Water Quality Control Board
Santa Ana Region
3737 Main Street, Suite 500
Riverside, California 92501

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

EXHIBIT A

Aluminum Precision Products, Inc. - Warner Ave Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | EPA Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/ WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| 2018 - 2019 REPORTING YEAR | | | | | | | | | |
| C | 11/29/2018 | Outfall #1 | Zinc (H) | 0.2 | mg/L | 0.11 | 1.82 | 0.12 | 1.67 |
| C | 11/29/2018 | Outfall #1 | Copper (H) | 0.023 | mg/L | 0.0123 | 1.87 | 0.013 | 1.77 |
| C | 11/29/2018 | Outfall #1 | TSS | 140 | mg/L | 100 | 1.40 | none | N/A |
| C | 11/29/2018 | Outfall #2 | Zinc (H) | 0.27 | mg/L | 0.11 | 2.45 | 0.12 | 2.25 |
| C | 11/29/2018 | Outfall #2 | Aluminum | 1.2 | mg/L | 0.75 | 1.60 | none | N/A |
| C | 11/29/2018 | Outfall #2 | Copper (H) | 0.045 | mg/L | 0.0123 | 3.66 | 0.013 | 3.46 |
| C | 11/29/2018 | Outfall #2 | Iron | 1.5 | mg/L | 1 | 1.50 | none | n/a |
| D | 11/29/2018 | Outfall #1 | Zinc (H) | 0.152 | mg/L | 0.11 | 1.38 | 0.12 | 1.27 |
| D | 11/29/2018 | Outfall #3 | Zinc (H) | 0.196 | mg/L | 0.11 | 1.78 | 0.12 | 1.63 |
| D | 11/29/2018 | Outfall #4 | Zinc (H) | 0.374 | mg/L | 0.11 | 3.40 | 0.12 | 3.12 |
| D | 11/29/2018 | Outfall #3 | Aluminum | 1.72 | mg/L | 0.75 | 2.29 | none | N/A |
| D | 11/29/2018 | Outfall #1 | Magnesium | 2.56 | mg/L | 0.064 | 40.00 | none | N/A |
| D | 11/29/2018 | Outfall #2 | Magnesium | 0.458 | mg/L | 0.064 | 7.16 | none | N/A |
| D | 11/29/2018 | Outfall #3 | Magnesium | 0.88 | mg/L | 0.064 | 13.75 | none | N/A |
| D | 11/29/2018 | Outfall #4 | Magnesium | 0.456 | mg/L | 0.064 | 7.13 | none | N/A |
| D | 11/29/2018 | Outfall #5 | Magnesium | 0.466 | mg/L | 0.064 | 7.28 | none | N/A |
| D | 11/29/2018 | Outfall #1 | Copper (H) | 0.03 | mg/L | 0.0123 | 2.44 | 0.013 | 2.31 |
| D | 11/29/2018 | Outfall #3 | Copper (H) | 0.0295 | mg/L | 0.0123 | 2.40 | 0.013 | 2.27 |
| D | 11/29/2018 | Outfall #4 | Copper (H) | 0.0172 | mg/L | 0.0123 | 1.40 | 0.013 | 1.32 |
| D | 11/29/2018 | Outfall #3 | Iron | 1.52 | mg/L | 1 | 1.52 | none | N/A |
| D | 11/29/2018 | Outfall #1 | N+N | 0.842 | mg/L | 0.68 | 1.24 | none | N/A |

EXHIBIT A

Aluminum Precision Products, Inc. - Warner Ave Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | EPA Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/ WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
|  | | | **2017 - 2018 REPORTING YEAR** | | | | | | |
| D | 1/8/2018 | Outfall #1 | Zinc (H) | 0.325 | mg/L | 0.11 | 2.95 | 0.12 | 2.71 |
| D | 1/8/2018 | Outfall #2 | Zinc (H) | 0.243 | mg/L | 0.11 | 2.21 | 0.12 | 2.03 |
| D | 1/8/2018 | Outfall #3 | Zinc (H) | 0.36 | mg/L | 0.11 | 3.27 | 0.12 | 3.00 |
| D | 1/8/2018 | Outfall #4 | Zinc (H) | 0.934 | mg/L | 0.11 | 8.49 | 0.12 | 7.78 |
| D | 1/8/2018 | Outfall #5 | Zinc (H) | 0.358 | mg/L | 0.11 | 3.25 | 0.12 | 2.98 |
| D | 1/8/2018 | Outfall #1 | Copper (H) | 0.0396 | mg/L | 0.0123 | 3.22 | 0.013 | 3.05 |
| D | 1/8/2018 | Outfall #2 | Copper (H) | 0.0195 | mg/L | 0.0123 | 1.59 | 0.013 | 1.50 |
| D | 1/8/2018 | Outfall #3 | Copper (H) | 0.0465 | mg/L | 0.0123 | 3.78 | 0.013 | 3.58 |
| D | 1/8/2018 | Outfall #4 | Copper (H) | 0.0349 | mg/L | 0.0123 | 2.84 | 0.013 | 2.68 |
| D | 1/8/2018 | Outfall #5 | Copper (H) | 0.031 | mg/L | 0.0123 | 2.52 | 0.013 | 2.38 |
| D | 1/8/2018 | Outfall #1 | Iron | 1.76 | mg/L | 1 | 1.03 | none | N/A |
| D | 1/8/2018 | Outfall #3 | Iron | 2.37 | mg/L | 1 | 5.33 | none | N/A |
| D | 1/8/2018 | Outfall #5 | Iron | 1.46 | mg/L | 1 | 2.53 | none | N/A |
| D | 1/8/2018 | Outfall #1 | N+N | 1.24 | mg/L | 0.68 | 1.82 | none | N/A |
| D | 1/8/2018 | Outfall #3 | N+N | 0.83 | mg/L | 0.68 | 1.22 | none | N/A |
| D | 1/8/2018 | Outfall #4 | N+N | 1.74 | mg/L | 0.68 | 2.56 | none | N/A |
| D | 1/8/2018 | Outfall #5 | N+N | 1.6 | mg/L | 0.68 | 2.35 | none | N/A |
| D | 1/8/2018 | Outfall #1 | Aluminum | 1.36 | mg/L | 0.75 | 1.81 | none | N/A |
| D | 1/8/2018 | Outfall #3 | Aluminum | 2.21 | mg/L | 0.75 | 2.95 | none | N/A |
| D | 1/8/2018 | Outfall #5 | Aluminum | 1.26 | mg/L | 0.75 | 1.68 | none | N/A |
| D | 1/8/2018 | Outfall #1 | Magnesium | 4.5 | mg/L | 0.064 | 70.31 | none | N/A |
| D | 1/8/2018 | Outfall #2 | Magnesium | 0.85 | mg/L | 0.064 | 13.28 | none | N/A |
| D | 1/8/2018 | Outfall #3 | Magnesium | 1.37 | mg/L | 0.064 | 21.41 | none | N/A |
| D | 1/8/2018 | Outfall #4 | Magnesium | 1.25 | mg/L | 0.064 | 19.53 | none | N/A |
| D | 1/8/2018 | Outfall #5 | Magnesium | 1.41 | mg/L | 0.064 | 22.03 | none | N/A |
| D | 3/22/2018 | Outfall #1 | Zinc (H) | 0.181 | mg/L | 0.11 | 1.65 | 0.12 | 1.5 |
| D | 3/22/2018 | Outfall #2 | Zinc (H) | 0.152 | mg/L | 0.11 | 1.38 | 0.12 | 1.27 |
| D | 3/22/2018 | Outfall #3 | Zinc (H) | 0.332 | mg/L | 0.11 | 3.02 | 0.12 | 2.77 |
| D | 3/22/2018 | Outfall #4 | Zinc (H) | 0.275 | mg/L | 0.11 | 2.50 | 0.12 | 2.29 |
| D | 3/22/2018 | Outfall #5 | Zinc (H) | 0.156 | mg/L | 0.11 | 1.42 | 0.12 | 1.30 |
| D | 3/22/2018 | Outfall #1 | Copper (H) | 0.035 | mg/L | 0.0123 | 2.85 | 0.013 | 2.69 |

EXHIBIT A
Aluminum Precision Products, Inc. - Warner Ave Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | EPA Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/ WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 3/22/2018 | Outfall #2 | Copper (H) | 0.0145 | mg/L | 0.0123 | 1.18 | 0.013 | 1.12 |
| D | 3/22/2018 | Outfall #3 | Copper (H) | 0.044 | mg/L | 0.0123 | 3.58 | 0.013 | 3.38 |
| D | 3/22/2018 | Outfall #4 | Copper (H) | 0.0195 | mg/L | 0.0123 | 1.59 | 0.013 | 1.50 |
| D | 3/22/2018 | Outfall #1 | Iron | 1.06 | mg/L | 1 | 1.06 | none | N/A |
| D | 3/22/2018 | Outfall #2 | Iron | 2.23 | mg/L | 1 | 2.23 | none | N/A |
| D | 3/22/2018 | Outfall #1 | N+N | 0.928 | mg/L | 0.68 | 1.36 | none | N/A |
| D | 3/22/2018 | Outfall #1 | Aluminum | 1.42 | mg/L | 0.75 | 1.89 | none | N/A |
| D | 3/22/2018 | Outfall #3 | Aluminum | 2.45 | mg/L | 0.75 | 3.27 | none | N/A |
| D | 3/22/2018 | Outfall #1 | Magnesium | 3.99 | mg/L | 0.064 | 62.34 | none | N/A |
| D | 3/22/2018 | Outfall #2 | Magnesium | 0.557 | mg/L | 0.064 | 8.70 | none | N/A |
| D | 3/22/2018 | Outfall #3 | Magnesium | 1.07 | mg/L | 0.064 | 16.72 | none | N/A |
| D | 3/22/2018 | Outfall #4 | Magnesium | 0.513 | mg/L | 0.064 | 8.02 | none | N/A |
| D | 3/22/2018 | Outfall #5 | Magnesium | 0.135 | mg/L | 0.064 | 2.11 | none | N/A |

EXHIBIT A

Aluminum Precision Products, Inc. - Warner Ave Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | EPA Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/ WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| 2016/2017 REPORTING YEAR | | | | | | | | | |
| D | 12/16/2016 | Outfall #1 | Zinc (H) | 0.215 | mg/L | 0.11 | 1.95 | 0.12 | 1.79 |
| D | 12/16/2016 | Outfall #2 | Zinc (H) | 0.2 | mg/L | 0.11 | 1.82 | 0.12 | 1.67 |
| D | 12/16/2016 | Outfall #3 | Zinc (H) | 0.202 | mg/L | 0.11 | 1.84 | 0.12 | 1.68 |
| D | 12/16/2016 | Outfall #4 | Zinc (H) | 0.322 | mg/L | 0.11 | 2.93 | 0.12 | 2.68 |
| D | 12/16/2016 | Outfall #5 | Zinc (H) | 0.582 | mg/L | 0.11 | 5.29 | 0.12 | 4.85 |
| D | 12/16/2016 | Outfall #3 | Aluminum | 1.14 | mg/L | 0.75 | 1.52 | none | N/A |
| D | 12/16/2016 | Outfall #1 | N+N | 0.71 | mg/L | 0.68 | 1.04 | none | N/A |
| D | 12/16/2016 | Outfall #3 | Iron | 1.19 | mg/L | 1 | 1.19 | none | N/A |
| D | 12/21/2016 | Outfall #1 | Oil & Grease | 15.9 | mg/L | 15 | 1.06 | none | N/A |
| D | 12/21/2016 | Outfall #1 | Zinc (H) | 0.774 | mg/L | 0.11 | 7.04 | 0.12 | 6.45 |
| D | 12/21/2016 | Outfall #2 | Zinc (H) | 0.345 | mg/L | 0.11 | 3.14 | 0.12 | 2.88 |
| D | 12/21/2016 | Outfall #3 | Zinc (H) | 0.395 | mg/L | 0.11 | 3.59 | 0.12 | 3.29 |
| D | 12/21/2016 | Outfall #4 | Zinc (H) | 0.325 | mg/L | 0.11 | 2.95 | 0.12 | 2.71 |
| D | 12/21/2016 | Outfall #5 | Zinc (H) | 0.755 | mg/L | 0.11 | 6.86 | 0.12 | 6.29 |
| D | 12/21/2016 | Outfall #1 | Aluminum | 1.61 | mg/L | 0.75 | 2.15 | none | N/A |
| D | 12/21/2016 | Outfall #2 | Aluminum | 0.753 | mg/L | 0.75 | 1.00 | none | N/A |
| D | 12/21/2016 | Outfall #3 | Aluminum | 2.87 | mg/L | 0.75 | 3.83 | none | N/A |
| D | 12/21/2016 | Outfall #1 | Iron | 1.56 | mg/L | 1 | 1.56 | none | N/A |
| D | 12/21/2016 | Outfall #3 | Iron | 2.04 | mg/L | 1 | 2.04 | none | N/A |
| D | 1/5/2017 | Outfall #1 | Zinc (H) | 0.839 | mg/L | 0.11 | 7.63 | 0.12 | 6.99 |
| D | 1/5/2017 | Outfall #2 | Zinc (H) | 0.455 | mg/L | 0.11 | 4.14 | 0.12 | 3.79 |
| D | 1/5/2017 | Outfall #3 | Zinc (H) | 0.2 | mg/L | 0.11 | 1.82 | 0.12 | 1.67 |
| D | 1/5/2017 | Outfall #4 | Zinc (H) | 0.201 | mg/L | 0.11 | 1.83 | 0.12 | 1.68 |
| D | 1/5/2017 | Outfall #5 | Zinc (H) | 1.17 | mg/L | 0.11 | 10.64 | 0.12 | 9.75 |
| D | 1/5/2017 | Outfall #1 | Aluminum | 1.51 | mg/L | 0.75 | 2.01 | none | N/A |
| D | 1/5/2017 | Outfall #2 | Aluminum | 1.21 | mg/L | 0.75 | 1.61 | none | N/A |
| D | 1/5/2017 | Outfall #1 | Iron | 2.36 | mg/L | 1 | 2.36 | none | N/A |
| D | 1/5/2017 | Outfall #2 | Iron | 1.33 | mg/L | 1 | 1.33 | none | N/A |
| D | 1/9/2017 | Outfall #1 | Zinc (H) | 0.534 | mg/L | 0.11 | 4.85 | 0.12 | 4.45 |
| D | 1/9/2017 | Outfall #2 | Zinc (H) | 0.235 | mg/L | 0.11 | 2.14 | 0.12 | 1.96 |
| D | 1/9/2017 | Outfall #4 | Zinc (H) | 0.254 | mg/L | 0.11 | 2.31 | 0.12 | 2.12 |

EXHIBIT A

Aluminum Precision Products, Inc. - Warner Ave Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | EPA Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/ WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 1/9/2017 | Outfall #5 | Zinc (H) | 0.968 | mg/L | 0.11 | 8.80 | 0.12 | 8.07 |
| D | 1/9/2017 | Outfall #1 | Aluminum | 0.894 | mg/L | 0.75 | 1.19 | none | N/A |
| D | 1/9/2017 | Outfall #1 | Iron | 1.21 | mg/L | 1 | 1.21 | none | N/A |
| D | 1/19/2017 | Outfall #1 | Zinc (H) | 0.261 | mg/L | 0.11 | 2.37 | 0.12 | 2.18 |
| D | 1/19/2017 | Outfall #2 | Zinc (H) | 0.251 | mg/L | 0.11 | 2.28 | 0.12 | 2.09 |
| D | 1/19/2017 | Outfall #3 | Zinc (H) | 0.139 | mg/L | 0.11 | 1.26 | 0.12 | 1.16 |
| D | 1/19/2017 | Outfall #4 | Zinc (H) | 0.228 | mg/L | 0.11 | 2.07 | 0.12 | 1.90 |
| D | 1/19/2017 | Outfall #5 | Zinc (H) | 0.32 | mg/L | 0.11 | 2.91 | 0.12 | 2.67 |
| D | 2/6/2017 | Outfall #1 | Zinc (H) | 0.165 | mg/L | 0.11 | 1.50 | 0.12 | 1.38 |
| D | 2/6/2017 | Outfall #2 | Zinc (H) | 0.128 | mg/L | 0.11 | 1.16 | 0.12 | 1.07 |
| D | 2/6/2017 | Outfall #4 | Zinc (H) | 0.146 | mg/L | 0.11 | 1.33 | 0.12 | 1.22 |
| D | 2/6/2017 | Outfall #5 | Zinc (H) | 0.452 | mg/L | 0.11 | 4.11 | 0.12 | 3.77 |
| D | 2/17/2017 | Outfall #2 | Zinc (H) | 0.118 | mg/L | 0.11 | 1.07 | 0.12 | N/A |
| D | 2/17/2017 | Outfall #4 | Zinc (H) | 0.304 | mg/L | 0.11 | 2.76 | 0.12 | 2.53 |
| D | 2/17/2017 | Outfall #5 | Zinc (H) | 0.308 | mg/L | 0.11 | 2.80 | 0.12 | 2.57 |
| D | 2/17/2017 | Outfall #3 | Aluminum | 0.837 | mg/L | 0.75 | 1.12 | none | N/A |
| | | | **2015/2016 REPORTING YEAR** | | | | | | |
| D | 9/15/2015 | Outfall #1 | Zinc (H) | 0.44 | mg/L | 0.11 | 4.00 | 0.12 | 3.67 |
| D | 9/15/2015 | Outfall #4 | Zinc (H) | 0.21 | mg/L | 0.11 | 1.91 | 0.12 | 1.75 |
| D | 1/5/2016 | Outfall #1 | Zinc (H) | 0.22 | mg/L | 0.11 | 2.00 | 0.12 | 1.83 |
| D | 1/5/2016 | Outfall #2 | Zinc (H) | 0.18 | mg/L | 0.11 | 1.64 | 0.12 | 1.50 |
| D | 1/5/2016 | Outfall #4 | Zinc (H) | 0.21 | mg/L | 0.11 | 1.91 | 0.12 | 1.75 |
| D | 3/11/2016 | Outfall #1 | Zinc (H) | 0.15 | mg/L | 0.11 | 1.36 | 0.12 | 1.25 |
| D | 3/11/2016 | Outfall #2 | Zinc (H) | 0.13 | mg/L | 0.11 | 1.18 | 0.12 | 1.08 |
| D | 3/11/2016 | Outfall #3 | Zinc (H) | 0.18 | mg/L | 0.11 | 1.64 | 0.12 | 1.50 |
| D | 3/11/2016 | Outfall #4 | Zinc (H) | 0.38 | mg/L | 0.11 | 3.45 | 0.12 | 3.17 |
| D | 3/11/2016 | Outfall #3 | Aluminum | 1.8 | mg/L | 0.75 | 2.40 | none | N/A |
| D | 3/11/2016 | Outfall #3 | Iron | 1.14 | mg/L | 1 | 1.14 | none | N/A |
| D | 5/6/2016 | Outfall #1 | Zinc (H) | 1.4 | mg/L | 0.11 | 12.73 | 0.12 | 11.67 |
| D | 5/6/2016 | Outfall #2 | Zinc (H) | 0.877 | mg/L | 0.11 | 7.97 | 0.12 | 7.31 |
| D | 5/6/2016 | Outfall #3 | Zinc (H) | 0.759 | mg/L | 0.11 | 6.90 | 0.12 | 6.33 |
| D | 5/6/2016 | Outfall #4 | Zinc (H) | 1.43 | mg/L | 0.11 | 13.00 | 0.12 | 11.92 |

EXHIBIT A
Aluminum Precision Products, Inc. - Warner Ave Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | EPA Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/ WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 5/6/2016 | Outfall #1 | Aluminum | 1.65 | mg/L | 0.75 | 2.20 | none | N/A |
| D | 5/6/2016 | Outfall #2 | Aluminum | 2.88 | mg/L | 0.75 | 3.84 | none | N/A |
| D | 5/6/2016 | Outfall #3 | Aluminum | 1.91 | mg/L | 0.75 | 2.55 | none | N/A |
| D | 5/6/2016 | Outfall #4 | Aluminum | 0.79 | mg/L | 0.68 | 1.16 | none | N/A |
| D | 5/6/2016 | Outfall #1 | N+N | 1.46 | mg/L | 0.68 | 2.15 | none | N/A |
| D | 5/6/2016 | Outfall #2 | N+N | 0.835 | mg/L | 0.68 | 1.23 | none | N/A |
| D | 5/6/2016 | Outfall #4 | N+N | 0.829 | mg/L | 0.68 | 1.22 | none | N/A |
| D | 5/6/2016 | Outfall #1 | Iron | 1.65 | mg/L | 1 | 1.65 | none | N/A |
| D | 5/6/2016 | Outfall #2 | Iron | 2.59 | mg/L | 1 | 2.59 | none | N/A |
| D | 5/6/2016 | Outfall #3 | Iron | 1.91 | mg/L | 1 | 1.91 | none | N/A |
| **2014/2015 REPORTING YEAR** | | | | | | | | | |
| D | 5/7/2015 | Outfall not available* | pH | 6.08 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | N/A |
| D | 12/2/2014 | Outfall not available* | pH | 6.25 | mg/L | 6.0-9.0 | N/A | 6.5-8.5 | N/A |
| D | 12/2/2014 | Outfall not available* | pH | 6.31 | mg/L | 6.0-9.0 | N/A | 6.5-8.5 | N/A |
| D | 12/2/2014 | Outfall not available* | Aluminum | 1.1 | mg/L | 0.75 | 1.47 | none | N/A |
| **2013/2014 Reporting Year** | | | | | | | | | |
| D | 2/28/2014 | Outfall #2 | Aluminum | 0.99 | mg/L | 0.75 | 1.32 | none | N/A |
| | | | | | | | **146** | | **76** |
| *(H)  - Hardness dependent: Assumes a hardness value of 75-100 mg/L | | | | | | | | | |
| *Outfall information unavaible on the State Water Board Resources Control Board system | | | | | | | | | |

EXHIBIT B

Rain Data - Santa Ana John Wayne Airport (Feb. 2014 - Feb. 2019)

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/27/2014 | 0.24 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/28/2014 | 1.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/1/2014 | 0.65 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 4/2/2014 | 0.12 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 4/25/2014 | 0.12 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/1/2014 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/2/2014 | 0.72 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/3/2014 | 0.6 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/12/2014 | 1.97 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/17/2014 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/30/2014 | 0.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/11/2015 | 0.6 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/26/2015 | 0.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/22/2015 | 0.22 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/23/2015 | 0.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/1/2015 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/2/2015 | 0.58 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/7/2015 | 0.39 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/8/2015 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/14/2015 | 0.37 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/15/2015 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 7/18/2015 | 0.18 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 7/19/2015 | 0.25 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 9/9/2015 | 0.29 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 9/15/2015 | 1.49 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/11/2015 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/13/2015 | 0.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/19/2015 | 0.16 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/22/2015 | 0.36 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/5/2016 | 0.88 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/6/2016 | 1.01 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/18/2016 | 0.3 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/6/2016 | 0.33 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/7/2016 | 0.25 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/11/2016 | 0.45 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/17/2016 | 0.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/23/2016 | 0.22 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/24/2016 | 0.58 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/20/2016 | 0.23 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/21/2016 | 0.36 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/26/2016 | 0.49 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/27/2016 | 0.18 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/15/2016 | 0.44 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/16/2016 | 0.69 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/21/2016 | 0.73 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/22/2016 | 0.71 |

EXHIBIT B

Rain Data - Santa Ana John Wayne Airport (Feb. 2014 - Feb. 2019)

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/23/2016 | 0.7 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/24/2016 | 0.31 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/31/2016 | 0.28 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/5/2017 | 0.3 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/9/2017 | 0.39 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/11/2017 | 0.12 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/12/2017 | 0.49 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/19/2017 | 0.7 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/20/2017 | 1.22 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/22/2017 | 2.27 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/23/2017 | 0.14 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/6/2017 | 1.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/7/2017 | 0.38 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/11/2017 | 0.14 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/17/2017 | 1.58 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/18/2017 | 0.15 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/26/2017 | 0.1 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/27/2017 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/8/2018 | 0.2 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/9/2018 | 0.9 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/26/2018 | 0.16 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/27/2018 | 0.16 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/10/2018 | 0.45 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/15/2018 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/22/2018 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/3/2018 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/12/2018 | 0.52 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/13/2018 | 0.21 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/22/2018 | 0.35 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/29/2018 | 0.77 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/5/2018 | 0.25 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/6/2018 | 3.24 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/5/2019 | 0.5 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/12/2019 | 1.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/14/2019 | 0.62 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/15/2019 | 0.95 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/16/2019 | 0.53 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/17/2019 | 0.52 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/31/2019 | 0.7 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/2/2019 | 1.55 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/3/2019 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/4/2019 | 0.63 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/5/2019 | 0.14 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/9/2019 | 0.23 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/10/2019 | 0.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/13/2019 | 0.27 |

EXHIBIT B

Rain Data - Santa Ana John Wayne Airport (Feb. 2014 - Feb. 2019)

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/14/2019 | 2.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/15/2019 | 0.12 |

# EXHIBIT B



February 21, 2019

**<u>VIA CERTIFIED MAIL – Return Receipt Requested</u>**

Gregory S. Keeler                              Ron Awrey
Chief Executive Officer                      Plant Engineer
Aluminum Precision Products, Inc.      Aluminum Precision Products, Inc.
3333 W. Warner Ave                          3333 W. Warner Ave
Santa Ana, CA 92704                         Santa Ana, CA 92704

Roark L. Keeler
Registered Agent for Service of Process
Aluminum Precision Products, Inc.
3333 W. Warner Ave
Santa Ana, CA 92704

**Re:     Notice of Violation and Intent to File Suit Under the Clean Water Act**

To Whom It May Concern:

        We write on behalf of Orange County Coastkeeper ("Coastkeeper") regarding violations of the Clean Water Act[1] and California's Industrial Storm Water Permit[2] ("Storm Water Permit") occurring at the Aluminum Precision Products, Inc. ("Aluminum Precision") facility located along South Susan Street, Santa Ana, CA 92704 (the "Susan Street Facility" or "Facility").[3] Aluminum Precision is a California Corporation headquartered in Santa Ana, where two additional Aluminum Precision Facilities are also located. The purpose of this letter is to put Aluminum Precision as the owners and operators[4] of the Susan Street Facility, on notice of the violations of the Storm Water Permit and the Clean Water Act occurring at the Susan Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Aluminum Precision is liable for violations of the Storm Water Permit and the Clean Water Act relating to Susan Street Facility.

        Section 505 of the Clean Water Act allows citizens to bring suit in federal court against facilities alleged to be in violation of the Clean Water Act and/or related Permits. Section 505 of

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, Order No. 97-03-DWQ, as amended by Order No. 2015-0057-DWQ.
[3] The Facility is comprised of six buildings on six separate parcels located at 3209 W. Central Ave, Santa Ana, CA, 92704; 3210 W. Central Ave, Santa Ana, CA, 92704; 3132 W. Central Ave, Santa Ana, CA, 92704; 2621 S. Susan Street, Santa Ana, CA, 92704; 2631 S. Susan Street, Santa Ana, CA, 92704; and 3151 W. Adams Street, Santa Ana, CA, 92704.
[4] The owners and/or operators of the Facility are identified in Section I (B) below and referred to hereinafter as the "the Facility Owners and/or Operators" or "Owners and/or Operators."



the Clean Water Act allows citizens to bring suit in federal court against facilities alleged to be in violation of the Clean Water Act and/or related permits. Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This letter is being sent to you as the responsible owners and/or operators of the Susan Street Facility, or as the registered agent for this entity. This notice letter ("Notice Letter") is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Aluminum Precision that Coastkeeper intends to file a federal enforcement action against Aluminum Precision  for violations of the Storm Water Permit and the Clean Water Act at the Susan Street Facility sixty (60) days from the date of this Notice Letter.

This letter constitutes notice of Coastkeeper's intent to sue Aluminum Precision for violations of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342, and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("Storm Water Permit"), Water Quality Order No. 97-03-DWQ ("1997 Permit"), as superseded by Order No. 2014-0057-DWQ and amended by Order No. 2015-0122 –DWQ ("2015 Permit ") (collectively "Storm Water Permit"), and recently amended but not yet adopted Order No. 20XX-XXX-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use. ("2018 Permit"). The 1997 Permit was in effect between 1997 and June 30, 2015, and the 2015 Permit went into effect on July 1, 2015. As explained below, the 2015 Permit includes many of the same fundamental requirements, and implements many of the same statutory requirements, as the 1997 Permit. Violations of these requirements constitute ongoing violations for purposes of Clean Water Act enforcement.

## I.    BACKGROUND

### A.    <u>Orange County Coastkeeper</u>

Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626. Coastkeeper has over 6,000 members who live and/or recreate in and around the Santa Ana River, Huntington Beach State Park, and greater Santa Ana River Watershed. Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further these goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

Members of Coastkeeper live and own homes in the Santa Ana River Watershed, and use and enjoy the waters to which the Susan Street Facility discharges storm water, including the

2



Santa Ana River and the Pacific Ocean, to participate in a variety of water sports and other activities, to view wildlife, recreate, and engage in scientific studies including monitoring activities. The discharge of pollutants from the Susan Street Facility impairs each of these uses. These discharges of polluted storm water from the Susan Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Aluminum Precisions' failure to comply with the Clean Water Act and the Storm Water Permit at the Susan Street Facility.

### B.      The Owners and/or Operators of the Aluminum Precision Facility

Aluminum Precision is currently an active California Corporation with California entity number C0497022. The listed registered agent for service is Roark L. Keeler, 3333 W. Warner Ave, Santa Ana, CA 92704. The registered California entity lists the entity address with the California Secretary of State as 3333 W. Warner Ave, Santa Ana, CA 92704.

Information available to Coastkeeper indicates that the Facility is comprised of six (6) Assessor's Parcel Number(s) ("APN"): 414-111-04, 414-111-11, 414-111-12, 414-111-35, 414-121-01, and 414-121-10, each with a separate address, but all adjacent to one another.[5] Each parcel is owned by Aluminum Precision. When Coastkeeper refers to owners and operators herein, those legally responsible for Aluminum Precision are referred to collectively as the Susan Street Facility "Owners and/or Operators."

The Susan Street Facility Owners and/or Operators have violated and continue to violate the procedural and substantive terms of their Storm Water Permits and the Clean Water Act for the Facility, including, but not limited to, the illegal discharge of pollutants into local surface waters and are liable for violations of the Storm Water Permits and the Clean Water Act.

### C.      The Aluminum Precision Facility's Storm Water Permit Coverage

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. *See* 2015 Permit, Finding #12. Upon information and belief, Aluminum Precision obtained Storm Water Permit coverage for the Facility on or about April 1, 1992 and obtained coverage under the 1997 Permit on May 21, 1997. On March 17, 2015, Aluminum Precision submitted an NOI for coverage under the 2015 Permit. The Facility NOI identifies the owner/operator of the Susan Street Facility as Aluminum Precision, with an address of 3333 W. Warner Ave, Santa Ana, CA 92704.

The NOI lists the Facility site size as five (5) acres,[6] with one (1) acre of industrial area exposed to Storm Water. The Industrial Receipt letter from the State Board to Aluminum Precision provides 8 30I002610 as the Waste Discharger Identification ("WDID") number for

---

[5] Addresses for the six (6) contiguous properties were detailed above.
[6] The April 17, 2018 SWPPP lists the facility as 5.3 acres total.



the Facility. The NOI lists the Primary Standard Industrial Classification ("SIC") code for the Facility as 3463 (Nonferrous Forgings). The Storm Water Permit classifies facilities with SIC code 3463 under "Fabricated Metal Products." *See* 2015 Permit §XI(B) Table 1.

> **D.** **Storm Water Pollution and the Waters Receiving the Aluminum Precision Facility's Discharges**

With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations such as the Susan Street Facility pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from industrial manufacturing facilities such as the Susan Street Facility can contain pH-affecting substances; metals such as iron, magnesium and aluminum; toxic metals such as lead, zinc, nickel, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS"); total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia-N; fuel additives; coolants; antifreeze; nitrate + nitrite nitrogen ("N+N"); trash; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm. Discharges of polluted storm water to the Santa Ana River and Pacific Ocean pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

The Facility discharges into the Santa Ana municipal separate storm sewer system ("MS4"). The MS4 drains to the Greenville Banning Channel, which empties to the Santa Ana River, which flows to the Pacific Ocean at Huntington Beach State Park. These bodies of water are collectively referred to herein as the "Receiving Waters." These discharges pose threats as described above and affect the use and enjoyment of these waters sought by members of Coastkeeper.

The Receiving Waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied species, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities. The public's use of local waterways exposes many people to toxic metals and other contaminants in storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.



The California Regional Water Quality Control Board, Santa Ana Region Regional Board ("Regional Board") issued the *Santa Ana River Basin Water Quality Control Plan* ("Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The existing and/or potential Beneficial Uses for the Santa Ana River include, at a minimum: warm freshwater habitat (WARM); water contact recreation (REC1); non-contact water recreation (REC2); commercial and sportfishing (COMM); wildlife habitat (WILD); rare, threatened or endangered species (RARE); spawning reproduction and development (SPWN); and marine habitat (MAR). *See* Basin Plan at Table 3-1. The Pacific Ocean from the San Gabriel River to Corona Del Mar also has numerous listed Beneficial Uses including water contact recreation (REC1); non-contact water recreation (REC2); shell fish harvesting (SHEL); commercial and sportfishing (COMM); wildlife habitat (WILD); rare, threatened or endangered species (RARE); spawning reproduction and development (SPWN); and marine habitat (MAR). *Id.*

According to the 2016 303(d) List of Impaired Water Bodies, the Santa Ana River is impaired for Indicator Bacteria.[7] Polluted discharges from industrial sites, such as the Susan Street Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife that depends on these waters.

## II.   THE ALUMINUM PRECISION FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A.   The Susan Street Facility Site Description and Industrial Activities

The Susan Street Facility is located in Santa Ana, CA 92704 near the intersection of South Susan Street and West Central Ave, specifically at the address of 2621 South Susan Street, Santa Ana, CA 92704.

This Facility is an aluminum forging facility that produces precision parts and components for aerospace and automotive applications including closed die and open ("hand") aluminum forgings. According to the SWPPP the Susan Street Facility operates 24 hours per day (Monday through Thursday) and 18 hours per day (Friday and Saturday). The company's website notes that the company employs approximately 650 people.[8]

Information available to Coastkeeper indicates that the Susan Street Facility has buildings purposed for several activities, including offices, burnishing operations, etching, pressing, heat treating and zyglo die penetrant, a die shop, and a maintenance shop. Used oil, oily water, coolants, solvents, acids, used lubricants, and scrap metals are pollutant used in, and byproducts of, these industrial processes. Track-out of metal debris, metal and other pollutant particulate, liquids such as coolant, solvent, degreaser, waste oil, oily water by machinery, and vehicle and foot traffic, and other fugitive emissions at the Facility, impact the storm water and the

---

[7] 2016 Integrated Report – All Assessed Waters, *available at*
https://www.waterboards.ca.gov/water_issues/programs/tmdl/2014_16state_ir_reports/category5_report.shtml (last accessed on January 22, 2018).
[8] See *http://www.aluminumprecision.com/about-app/* (last accessed on December 12, 2018).



environment due to a lack of containment. Exhaust and other internal discharge at the Susan Street Facility also impacts storm water. Certain industrial activities and storage occur outside, without adequate cover, containment or other measures, resulting in discharges of polluted storm water. Scrap metal, active and inactive industrial equipment, raw materials and finished product are stored outdoors and impact storm water runoff. Fugitive dust, debris, particulate, exhaust emissions and other pollutants at Facility are also uncontained and enter local waterways via storm water, unauthorized non-storm water discharge and aerial deposition. These industrial activities and contaminant factors create significant sources of pollution at the Facility.

Pollutants associated with operations at the Facility include, but are not limited to: pH-affecting substances; metals such as iron and aluminum; toxic metals such as lead, copper and zinc; TSS; gasoline and diesel fuels; fuel additives; coolants; trash; and nitrate as nitrogen.

Coastkeeper alleges that Aluminum Precision has not properly developed and/or implemented the required best management practices ("BMPs") to address pollutant sources and contaminated discharges. BMPs are necessary at the Susan Street Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events. Consequently, during rain events storm water carries pollutants from the Facility's raw and finished material, oil, and chemical storage areas, parking areas, fueling and maintenance areas, loading and unloading areas, garbage and refuse storage areas, scrap metal areas, equipment washing areas, and other areas into the municipal separate storm sewer system, which flows into the Receiving Waters, in violation of the Storm Water Permit.

Information available to Coastkeeper indicates that metal particulates have been and continue to be tracked from the manufacturing buildings, raw material and refuse storage areas, parking areas, and equipment maintenance and washing areas throughout the Susan Street Facility. Further, numerous pollutants are believed to accumulate on the roofs of the Facility due to exhaust emissions from furnaces, other industrial heat sources, air conditioners and other heating and air discharge equipment, resulting in polluted storm water and non-storm water discharges from the Facility. In addition to the roofs, these pollutants accumulate in parking, loading and unloading areas, and the driveways of the Facility. As a result, trucks and vehicles leaving the Facility via the driveways are track sediment, dirt, metal particles, and other pollutants off-site.

### B.   **The Aluminum Precision Facility's Storm Water Flow and Discharge Locations**

Publicly available information indicates that storm water at the Susan Street Facility is discharged off site from seven (7) discharge points via driveways into West Central Avenue ("West Central"), West Adams Street ("West Adams") and South Susan Street ("South Susan"). Storm water flows west from West Central and West Adams and drains to South Susan. From there, the storm water flows near to the intersection with Segerstrom Street where it enters the Santa Ana MS4. Outfall 1 is on the 3029 West Central property adjacent to South Susan. Outfall 2 is on the same property next to the parking lot, near to West Central. Outfall 3 is located on the 3210 West Central property between the two parking lots. Outfall 4 is between the 3210 West Central building and the 2621 South Susan building near South Susan. Outfall 5 is south of the



2621 South Susan building, and Outfall 6 is between the buildings at 3151 West Adams and 2631 South Susan in the parking lot. Outfall 7 is near the corner of South Susan Street and West Adams on the 2631 South Susan property.

The Susan Street Facility Storm Water Pollution Prevention Plan ("SWPPP") does not identify down spouts from the roofed areas of the manufacturing buildings; it is unknown which discharge points handle storm water runoff originating from roofed areas. After storm water enters the drain inlets it flows into the MS4 and is discharged to the Greenville Banning Channel and into the Santa Ana River.

Coastkeeper obtained information indicating that machinery, equipment and industrial and raw materials are stored outdoors at the Susan Street Facility. The exposed die storage area is on the 3209 West Central property at the northernmost part of the Susan Street Facility, close to the hazardous waste storage area. Drums, pallets, scrap metal and casts exist throughout the outdoor areas of the Facility without adequate secondary containment. These industrial materials are uncovered, stored on the ground, and exposed to storm water. Information available to Coastkeeper also indicates that the Facility has large air conditioning and cooling units that produce non-storm water discharges. Several roofs of the buildings at the Susan Street Facility are stained with what appears to be soot from exhaust and other emissions resulting from the industrial activity at the Facility.

## III.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMITS

The Clean Water Act requires that any person discharging pollutants to a water of the United States from a point source[9] obtain coverage under an NPDES permit. *See* 33 U.S.C. §§ 1311(a), 1342; 40 CFR § 122.117(c)(1). CWA § 402 further requires each discharger to meet minimum technology-based treatment requirements. Discharges of toxic pollutants must be treated pursuant to the best available technology ("BAT"), 33 U.S.C. § 1311 (b)(2)(A), and other pollutant discharges must comply with best conventional technology ("BCT"). 33 U.S.C. § 1311(b)(2)(E).

In addition to implementing technology-based controls, each point source discharger must achieve "any more stringent limitation necessary to meet water quality standards[.]" 33 U.S.C. § 1311(b)(1)(C). Water quality standards establish the water quality goals for a water body. 40 C.F.R. § 131.2. They serve as the regulatory basis for the establishment of water quality-based controls over point sources, as required under § 301 and § 306 of the CWA. Once water quality standards are established for a particular water body, any NPDES permit authorizing discharges of pollutants into that water body must ensure that the applicable water

---

[9] A point source is defined as any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2



quality standard will be met. 33 U.S.C. § 1311(b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

The 1997 Permit requires dischargers meet all applicable provisions of Sections 301 and 402 of the CWA. Rather than requiring specific application of BAT and BCT techniques to each storm water discharge, compliance with the terms and conditions of the 1997 Permit served as a proxy for meeting the BAT/BCT mandate. *See* 1997 Permit, Finding 10. Conversely, failure to comply with the terms and conditions of the 1997 Permit constitutes failure to subject discharges to BAT/BCT, and is a violation of the CWA.

The 2015 Permit includes the same fundamental terms as the 1997 Permit. The 2015 Permit retains this core statutory requirement to meet BAT/BCT standards. Just like the 1997 Permit, the 2015 Permit requires all facility operators to develop and implement SWPPP that includes BMPs, although the 2015 Permit now requires operators to implement certain minimum BMPs, as well as advanced BMPs as necessary, to achieve compliance with the effluent and receiving water limitations of the 2015 Permit. Advanced BMP categories are defined as follows: (1) exposure minimization BMPs, (2) storm water containment and discharge reduction BMPs, (3) treatment control BMPs, and (4) additional advanced BMPs needed to meet the effluent limitations of the 2015 Permit. Coastkeeper alleges that Susan Street Facility Owners and/or Operators have failed to implement advanced BMPs as necessary to meet the effluent limitations of the 2015 Permit, as borne out by the Facility's self-reported storm water sampling results. *See* Exhibit A. The 2015 Permit also requires all facility operators to sample storm water discharges more frequently than the 1997 Permit, and to compare sample and analytical results with numeric action levels ("NALs").

Under the 2015 Permit Facility operators are required to perform Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL exceedances. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year[10] exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. 2015 Permit XII.A. There are two (2) ERA levels, Level 1 and Level 2. If a discharger enters Level 1 for exceedances of any constituent in a reporting year that facility must prepare a Level 1 ERA to adequately address the polluted discharges. Should the facility's sample results average over the annual NAL for a second consecutive year for the same constituent, the facility must prepare a Level 2 ERA requiring further BMPs to address the exceedances.

Coastkeeper has reviewed each of the four (4) ERA's submitted by the Owners and/or Operators of the Susan Street Facility and alleges that each of the ERA's are inadequate to address pollutant discharges from the Facility, in part due to the lack of implemented advanced BMPs, or plans for implementing advanced BMPs. The two (2) ERA's submitted in December

---

[10] A reporting year encompasses a full calendar year from July 1, through June 30 of the following year.



2018 fail to include implementation of any additional BMPs, and do not address constituents for which the Susan Street Facility should have entered Level 2: zinc, aluminum, and nitrate and nitrite nitrogen. Similarly, the ERA Level 1 submitted in December 2017 also ignored zinc, aluminum, and nitrate and nitrite nitrogen despite the Susan Street Facility averaging over the NAL for those constituents. The 2017 Level 1 ERA and 2018 Level 2 ERA address only iron. The 2018 Level 1 ERA addresses copper and magnesium.

Industrial activities conducted at the Susan Street Facility under SIC code 3463 require Aluminum Precision to obtain Storm Water Permit coverage for the Facility. Both the 1997 Permit and the 2015 Permit generally require facility operators to: (1) submit a Notice of Intent ("NOI") that certifies the type of activity or activities undertaken at the facility and committing the operator to comply with the terms and conditions of the permit; (2) eliminate unauthorized non-storm water discharges; (3) develop and implement a SWPPP; (4) perform monitoring of storm water discharges and authorized non-storm water discharges; and (5) file an Annual Report that summarizes the year's industrial activities and compliance with the Storm Water Permit. Facilities must strictly comply with all of the terms and conditions of the Storm Water Permit. A violation of the Storm Water Permit is a violation of the CWA.

### A.  <u>Applicable Effluent Standards or Limitations</u>

The Storm Water Permit requires all industrial facilities to sample and analyze storm water discharges for the following parameters: pH, total suspended solids ("TSS"), and oil and grease ("O&G"). *See* 1997 Permit, § B(5)(c)(i); 2015 Permit, §§ XI(B)(6)(a), (b). Facilities classified under SIC code 3463 – Nonferrous Forgings – must also sample and analyze samples for zinc ("Zn"), iron ("Fe"), aluminum ("Al"), and nitrate and nitrite nitrogen ("N+N"). *See* 2015 Permit, § VI(B) at Table 1. Indeed, dischargers must also sample for additional parameters identified by the Discharger that are likely to be present under the Facility pollutant source assessment and additional parameters related to receiving waters with 303(d) listed impairments. 2015 Permit, § XI(B). Here, the Susan Street Facility did not sample for copper until 2018 and immediately realized effluent limit exceedances resulting in the Facility's entry into Level 1 ERA. A copper test result from January 8, 2018 registered at 0.305 mg/l, 24 times over the EPA Benchmark adjusted for an expected water hardness level in the Receiving Water.

The EPA has published "benchmark" levels as numeric thresholds for helping to determine whether a facility discharging industrial storm water has implemented the requisite BAT and BCT mandated by the CWA. (See *United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity*, as modified effective June 4, 2015.[11]) These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish. EPA benchmarks have been established for pollutants discharged by the Facility, and include: TSS—100 mg/L; Zn—0.11 mg/L; Cu—.0123 mg/L; and pH—6.0-9.0 s.u. However, the Basin Plan

---

[11] Available at https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf (last accessed on December 12, 2018).



contains narrower effluent levels for pH: for bays and estuary waters, pH—7.0-8.6 s.u; for inland surface waters, pH —6.5-8.5 s.u.

The Criteria for Priority Toxic Pollutants in the State of California, or California Toxics Rule ("CTR"), set forth in 40 C.F.R. § 131.38, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. The CTR sets forth lower numeric limits for zinc and other pollutants such as copper (0.010 mg/l) and nickel (0.037) in freshwater surface waters with water hardness calculation of 75 mg/L[12]; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[13] Coastkeeper puts Aluminum Precision on notice that they have violated, and continue to violate the CTR, and by extension the Clean Water Act, for zinc, copper and other constituents each time polluted storm water discharges from the Susan Street Facility.

Courts have expressly held that the EPA Benchmarks are relevant objective standards for evaluating whether the best management practices implemented by a permittee achieve effluent limitations. *See* Santa Monica Baykeeper v. Kramer Metals, Inc., 619 F.Supp.2d 914, 924 (C.D. Cal. 2009) (holding that "EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs"). Thus, comparing EPA Benchmarks and NALs to stormwater monitoring data is sufficient to support a good faith allegation of noncompliance with the technology and/or water-quality based effluent limitations in the General Permit: [exceedance] of the benchmark levels is evidence . . . that [Defendant] did not have BMPs that achieve BAT/BCT[;] . . . however, this evidence in and of itself does not establish a violation of [BAT/BCT]. . . . There can be no reasonable dispute that the Benchmarks are relevant to the inquiry as to whether a facility implemented BMPs. Id. at 925 (emphasis added), citing Waterkeepers Northern California v. AG Industrial Mfg., Inc., 375 F.3d 913, 919 n. 5 (9th Cir. 2004).

Thus, storm water sampling results provide well-founded evidence of a failure to comply with the Storm Water Permit's discharge prohibitions, receiving water limitations and effluent limitations. A monitoring report showing "a water sample with pollutant discharges in excess of permit limits is conclusive evidence of a violation . . .. A defendant may not impeach its own publicly filed reports which are submitted under penalty of perjury." San Francisco Baykeeper v. West Bay Sanitary District, 791 F.Supp.2d 719, 755 (N.D. Cal 2011) [cites and quotes omitted]; see also Sierra Club v. Union Oil, 813 F.2d 1480, 1493 (9th Cir. 1988).

The Susan Street Facility Owners and/or Operators have self-reported numerous exceedances of relevant standards at least since 2014, including values several orders of

---

[12] Exhibit A uses CTR limits with a water hardness calculation of 100 mg/L for zinc, copper and lead.

[13] The CTR numeric limits, or "criteria", are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18. To compare sample results reported by the Facility with the CTR criteria, Coastkeeper will use the CTR criteria converted to total metal concentrations set forth in the State Board's "Water Quality Goals" database. The formula used to convert the CTR criteria to total metal concentrations is set forth in the CTR at 40 C.F.R. § 131.38(b)(2)(i). The applicable CTR criteria also requires a hardness value.



magnitude above regulatory limits. *See* Exhibit A. For example, based upon a hardness value of 75-100 mg/L for the receiving waters, the effluent limitation for Cu is .0123 mg/L. See 2015 Permit, Appendix J, "Calculating Hardness in Receiving Waters for Hardness Dependent Metals." Self-reported testing submitted to the Regional Water Quality Control Board (RWQCB) showed exceedances of the EPA Benchmark for Cu, among others, by magnitudes as great as 24.8 and 10.97 at the Facility. *Id.*

Thus, Coastkeeper alleges that the Susan Street Facility Owners and/or Operators violate the Storm Water Permit by discharging storm water containing pollutants in excess of, or outside the range of, the applicable effluent limitations each time Aluminum Precision discharges storm water from the Facility. *See, e.g.*, Exhibit B. These discharge violations are ongoing and will continue every day the Owners and/or Operators discharge storm water from the Facility that contains concentrations of pollutants in excess of, or outside the range of, the applicable effluent limitations. Coastkeeper will include additional violations as information and data become available. Further, given that these effluent limitation violations are ongoing, and recent test results evidence additional effluent violations, Coastkeeper puts the Owners and/or Operators on notice that Effluent Limitation V.B. of the 2015 Permit is violated each time storm water is discharged from the Facility. Every Facility discharge of polluted storm water in violation of Effluent Limitation B(3) of the Storm Water Permit and Effluent Limitation V.B. of the 2015 Permit is a separate violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 21, 2014.

## B.  Discharges of Polluted Storm Water from the Aluminum Precision Facility in Violation of Storm Water Permit Effluent Limitations

The Storm Water Permit states that storm water discharges from facilities shall not exceed specified effluent limitations. 1997 Permit, Effluent Limitation B(1); 2015 Permit, Effluent Limitation V.B. Compliance with the effluent limitation guidelines constitutes compliance with best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") for the specified pollutants and must be met to comply with the Storm Water Permit. 1997 Permit, Fact Sheet at VIII; 2015 Permit, Fact Sheet at pp. 15-17.

Certain activities undertaken at the Susan Street Facility produce significant risks to water quality, including metal shavings and dust and other scrap metal. The Facility's April 2018 SWPPP indicates in Table 4-3, On-Site Industrial Material Management, that materials present include oils and lubricants, acids and solvents, cutting fluid, transmission fluid, die protectant, cleaners, flocculent, scrap metal, and sludge. Discharges of storm water from this Facility contain elevated levels of many of the pollutants that the Facility is required to test for, and self-report and include numerous self-reported sampling results over applicable benchmarks. *See* Exhibit A. These exceedances of applicable benchmarks degrade water quality. BAT/BCT standards are intended to reduce pollutants in storm water discharges through required implementation of BMPs, implementation of BMPs that Coastkeeper alleges have been inadequate. Thus far only a single advanced BMP has been implemented at the Susan Street



Facility pursuant to the Facility ERAs. Recent sample results provide needed evidence that the BMPs at the Facility are not meeting the BAT/BCT requirements of the Storm Water Permit.

Because manufacturing facilities using metals are likely to discharge storm water runoff that is contaminated, the EPA provides a storm water fact sheet for Primary Metals Facilities. *See* Environmental Protection Agency, *Sector f: Primary Metals Facilities* (EPA-833-F-06-021) December 2006 ("Sector F Fact Sheet").[14] The fact sheet offers facility operators guidance on how to prepare storm water management programs that are appropriate for their facility and operations. Table 1 of the Sector F Fact Sheet sets forth the EPA chart regarding the various pollutant sources and pollutants that are typically associated with facilities such as the Aluminum Precision Facility. Despite this EPA guidance, Aluminum Precision only started sampling for copper, nickel, lead and magnesium in 2018.

## C.   Discharges of Polluted Storm Water from the Aluminum Precision Facility in Violation of BAT/BCT

The Storm Water Permit and Clean Water Act require dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve BAT for toxic[15] and non-conventional pollutants and BCT for conventional pollutants.[16] 33 U.S.C. §§ 1311 (b)(2)(A) and (b)(2)(E); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V.A. The Effluent Limitations define application of BAT for TSS and pH as numeric effluent limitations. A discharge of storm water which exceeds the Effluent Limitations is strong evidence of a failure to achieve BAT/BCT. EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards.[17]

Publicly available information shows that the Susan Street Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs at the Facility that achieve compliance with the BAT/BCT standards. Consistent with Aluminum Precision's lack of adequate BMPs, the analytical results of storm water sampling at the Facility demonstrates the Owners and/or Operators have failed and continue to fail to implement BAT/BCT. Specifically, analysis of discharges from the Susan Street Facility reveals that storm water discharges consistently contain concentrations of pollutants above the Effluent Limitations and EPA Benchmarks. *See* Exhibit A. For example, taking into account EPA water hardness calculations, the EPA Benchmark for zinc is .11 mg/L. A storm water sample that Aluminum Precision collected from the Susan Street Facility in January 2019 exceeded the EPA Benchmark by over 11 times. Testing for zinc from February 2014 through November 2018 evidences 96

---

[14] Available at: https://www3.epa.gov/npdes/pubs/sector_f_primarymetals.pdf (last accessed on December 11, 2018)

[15] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.

[16] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, TSS, oil and grease, pH, and fecal coliform.

[17] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System,* as modified effective February 26, 2009 ("Multi-Sector Permit") at 136; *see also,* 65 Federal Register 64851 (2000).



exceedances of the EPA Benchmark. The EPA Benchmark for aluminum is .75 mg/L. A storm water sample that Aluminum Precision collected from the Facility in November 2018 exceeded the aluminum EPA Benchmark by over 3 times. Testing for aluminum from February 2014 through November 2018 shows 62 exceedances of the EPA Benchmark. In sum, Coastkeeper identified 302 exceedances of EPA Benchmarks over the last four and a half reporting years.

As noted above in Section III(B), with an estimated hardness value for the receiving waters of 75-100 mg/L, the EPA Benchmark for Cu is .0123 mg/L. Testing for Cu between September 2015 into November 2018 shows 19 exceedances of the EPA Benchmark level, two of which by magnitudes of 24.8 and 10.98. The repeated and significant exceedances of the EPA Benchmark demonstrate that the Susan Street Facility Owners and/or Operators have failed to develop and/or implement required BMPs at the Facility that achieve compliance with the BAT/BCT standards.

Publicly available evidence indicates that the Susan Street Facility Owners and/or Operators violate the Storm Water Permit and Clean Water Act for failing to develop and/or implement BMPs that achieve BAT/BCT each time Aluminum Precision discharges storm water from the Facility. *See, e.g.*, Exhibit B. These discharge violations are ongoing and continue every time the Susan Street Facility discharges polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Coastkeeper will add dates of violation when additional data becomes available, indeed the most recent samples show additional exceedances. Further, the Facility has violated Effluent Limitation B(3) of the 1997 Permit or Effluent Limitation V.A. of the 2015 Permit each time storm water discharged from the Susan Street Facility since February 21, 2014, and each discharge represents a distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act over the past five years and continuing until full compliance with the Storm Water Permit is achieved.

### D.  Discharges of Polluted Storm Water from the Aluminum Precision Facility in Violation of Receiving Water Limitations

The Storm Water Permit and the CWA prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[18] 33 U.S.C. § 1311 (b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d); 2015 Permit, Receiving Water Limitation VI.A; 1997 Permit, Receiving Water Limitation C(2). Discharges that contain pollutants in excess of an applicable WQS violate these requirements.

---

[18] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan.



The Storm Water Permit also prohibits storm water discharges and unauthorized non-storm water discharges to surface water that adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Receiving Water Limitation VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of Receiving Water Limitation C(1) of the 1997 Permit, Receiving Water Limitation VI.B. of the 2015 Permit, and the Clean Water Act.

Storm water sampling at the Susan Street Facility demonstrates discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS. For example, the pH Basin Plain criteria range is between 6.5-8.5 s.u. for inland surface waters such as the Santa Ana River, and 7-8.6 s.u. for estuary and bay water bodies, such as the Santa Ana River estuary. The Facility's 2016-17 storm water samples measured 8.65 s.u. at Outfall 6 (12/16/2016), 8.54 s.u. at Outfall 2 (12/21/2016), 8.81 s.u. at Outfall 1, 8.79 s.u. at Outfall 2, and 9.0 s.u. at Outfall 3 (1/5/2017), all above the Basin Plan criteria for pH. These exceedances of WQS demonstrate that Aluminum Precision has violated and continues to violate Receiving Water Limitation C(2) of the 1997 Permit, and Receiving Water Limitation VI.A. of the 2015 Permit.

The Receiving Waters may become impaired with pollutants discharging from Facilities like the Susan Street Facility. Information available to Coastkeeper indicates that the Susan Street Facility's storm water discharges contain elevated concentrations of pollutants, such as copper and pH, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Santa Ana River, and the Pacific Ocean. *See* Exhibit A. These harmful discharges from the Facility are violations of Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI.B. of the 2015 Permit.

Coastkeeper puts the Susan Street Facility Owners and/or Operators on notice that Receiving Water Limitation C(1) and/or (2) of the 1997 Permit VI.A. and VI.B. of the 2015 Permit were/are violated with each polluted storm water discharge from the Facility. *See, e.g.*, Exhibit B. These discharge violations are ongoing and continue every time contaminated storm water is discharged in violation of Receiving Water Limitations. Each time discharges of storm water from the Susan Street Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation C(1) of the 1997 Permit, Receiving Water Limitation VI.A. of the 2015 Permit VI.A, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation C(2) of the 1997 Permit, Receiving Water Limitation VI.B. of the 2015 Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Coastkeeper will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since February 21, 2014.



### E.   Unauthorized Non-Storm Water Discharges from the Aluminum Precision Facility

The Storm Water Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. 2015 Permit, Discharge Prohibition III.B; 1997 Permit, Discharge Prohibition A(1). Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III.B.

Further, Coastkeeper is informed and believes that unauthorized non-storm water discharges occur at the Susan Street Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. As an example, unauthorized non-storm water discharges may occur at the Facility from process water, cooling functions, and/or equipment, vehicle and machinery cleaning activities. The Facility Owners and/or Operators conduct these activities without BMPs to prevent related non-storm water discharges. Non-storm water discharges resulting from cooling functions and equipment washing are not listed among the authorized non-storm water discharges in the Storm Water Permit and thus are always prohibited.

Coastkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit is violated each time non-storm water is discharged from the Facility. These discharge violations are ongoing and will continue until the Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. Each time the Facility Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition A(1) of the 1997 Permit and Discharge Prohibition III.B. of the 2015 Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since February 21, 2014.

### F.   Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit. The objectives of the SWPPP requirement are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from an industrial Facility, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations. To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis, and must be revised as necessary to ensure compliance with the Storm Water Permit. *See* 1997 Permit, §§ A(1)-A(10) and Provision E(2); 2015 Permit, §§ X.A.-C.



Among other requirements, the SWPPP must include: a site map showing the Facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the Facility and its industrial activities; a list of significant materials handled and stored at the site; a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, non-storm water discharges and their sources, and locations where soil erosion may occur; and an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. 1997 Permit §§ A(3)-A(10); 2015 Permit, § X.D.-H.

The Susan Street Facility Owners and/or Operators have continuously conducted operations at the Facility with an inadequately developed and/or implemented SWPPP. For example, descriptions of BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective, are inadequate and incomplete, and do not address all the applicable constituents, notwithstanding the Facility's history of noncompliance regarding those constituents. The Owners and/or Operators have failed to properly revise the Facility's SWPPP to ensure compliance with the Storm Water Permit. The Facility's current SWPPP is recent, dated April 2018, yet despite the significant concentrations of pollutants in the Facility's storm water discharges every year since at least the 2014-2015 Wet Season[19], it does not include sufficiently effective BMPs to eliminate or reduce these pollutants, as required by the 1997 Permit or the 2015 Permit.

The Facility Owners and/or Operators have failed to adequately develop, implement, and/or revise a SWPPP, in violation of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily violation of the Storm Water Permit's SWPPP requirements since at least February 21, 2014. Violations are ongoing, subjecting Aluminum Precision to civil penalties for each past violation of the Clean Water Act with additional violations added when such information is available.

### G.  Failure to Develop and Implement an Adequate Monitoring Plan

Section B(1) and Provision E(3) of the 1997 Permit require Facility Owners and/or Operators to develop and implement an adequate Monitoring and Reporting Program by October 1, 1992, or prior to the commencement of industrial activities at the Facility, that meets all of the requirements of the Storm Water Permit. Section XI of the 2015 requires dischargers to prepare a Monitoring Implementation Plan. The primary objective of the required monitoring is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with

---

[19] The Storm Water Permit defines the Wet Season as October 1 – May 30.



the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit, § B(2); 2015 Permit § XI. Monitoring must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id*.

Sections B(5) and B(7) of the 1997 and Section XI of the 2015 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged. Under the 1997 Permit, the Facility Owners and/or Operators are required to collect at least two (2) samples from each discharge location at their Facility during the Wet Season. Storm water samples must be analyzed for TSS, pH, total organic carbon or O&G, and other pollutants that are likely to be present in the Facility's discharges in significant quantities, and pursuant to a facility's SIC code. *See* 1997 Permit, § B(5)(c). Under the 2015 Permit discharges must collect at least two (2) samples from QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs from the second half of each reporting year (January 1 to June 30) (2015 Permit § X.B.3), which must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code. 2015 Permit § X.G.2.

The Owners and/or Operators of the Susan Street Facility have conducted operations at the Facility with an inadequately developed, implemented, and/or revised monitoring plan. Upon information and belief, the Facility Owners and/or Operators have not collected samples from sufficient Qualifying Storm Events ("QSE") at the Facility in at least one reporting year over the past five years. Failing to collect sufficient Aluminum Precision under reported for those years, in violation of Section B(5) of the Storm Water Permit. For example, only two (2) QSE were sampled in the 2017-2018 reporting year though there were seven (7) rain events of over .1 inch of rain in the first three months on 2018 reported at the Santa Ana Airport. Five of those rain events were at least 48 hours apart.

Additionally, the Facility Owners and/or Operators failed to provide adequate records, as required by Section B(4) of the 1997 Permit and Section X.A of the 2015 Permit, for the monthly visual observations of storm water discharges. The Storm Water Permit further requires dischargers to document the presence of any floating and suspended material, O&G, discolorations, turbidity, odor and the source of any pollutants. 1997 Permit, § B(4)(c); 2015 Permit § X.2.C. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. Section B(4) of the 1997 Permit and Section X.A of the 2015 Permit. *See* Exhibit B.

Thus, Coastkeeper alleges that the Susan Street Facility Owners and/or Operators failed to properly collect samples from an adequate number of QSE annually, and conduct, fully document and report the required observations of storm water discharges.

The Susan Street Facility Owners' and/or Operators' failure to conduct sampling and monitoring as required by the Storm Water Permit provides sufficient evidence that the Facility's

17



monitoring plan fails to comply with the requirements of Section B and Provision E(3) of the 1997 Permit and Section XI of the 2015 Permit. Every day that operations at the Facility are conducted in violation of the monitoring requirements of the Storm Water Permit is a separate violation of the Storm Water Permit and the Clean Water Act. The Susan Street Facility has violated the Storm Water Permit's monitoring requirements each day since at least February 21, 2014, subjecting the Facility Owners and/or Operators to civil penalties for all violations of the Clean Water Act since February 21, 2014. These violations are ongoing.

### H.  **Failure to Comply with the Storm Water Permit's Reporting Requirements**

Section B(14) of the 1997 Permit and Section XVI of the 2015 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. The Annual Report must include an explanation for incomplete visual observations and sampling results and an explanation of why a permittee did not implement any activities required by the Storm Water Permit. *See* 1997 Permit § B(13); 2015 Permit, § XVI.

Coastkeeper alleges that the Susan Street Facility Owners and/or Operators have failed and continue to fail to submit Annual Reports that comply with the Storm Water Permit reporting requirements. For example, the Facility Owners and/or Operators certified that the SWPPP's BMPs address existing potential pollutant sources, complies with the Storm Water Permit or will be revised to achieve compliance. Coastkeeper has information suggesting that these certifications are erroneous. Storm water samples collected from the Facility have consistently contained concentrations of pollutants above Benchmark Levels, demonstrating that the SWPPP's BMPs have never adequately addressed existing potential pollutant sources. Further, the Facility's SWPPP does not include elements required by the Storm Water Permit, such as additional advanced BMPs given the Facility's industrial activities (metal forging).

Coastkeeper alleges that the Susan Street Facility submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of the Storm Water Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Susan Street Facility has been in daily and continuous violation of the Storm Water Permit's reporting requirements each day since at least February 21, 2014, subjecting them to civil penalties for such violations over this same time period. These violations are ongoing, and additional violations will be included when such information becomes available, including further violations of the 2015 Permit reporting requirements (*see* 2015 Permit, § XVI.).

## IV.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the Clean Water Act occurring before November 2, 2015 commencing five years prior to the date of this Notice of Violation and Intent to File Suit subjects Aluminum Precision to a penalty



of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after January 15, 2018 subjects Aluminum Precision to a penalty of up to $53,484 per day. In addition to civil penalties, Coastkeeper will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d) of the Clean Water Act (33 U.S.C. §§ 1365(a), (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Clean Water Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

## V.    CONCLUSION

Coastkeeper is willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Coastkeeper will file a citizen suit under Section 505(a) of the Clean Water Act for Aluminum Precision's violations of the Storm Water Permit.

If you wish to pursue settlement discussions, please contact Coastkeeper's legal counsel:

> Aqua Terra Aeris Law Group
> Anthony Barnes
> Jason R. Flanders
> amb@atalawgroup.com
> 490 43rd Street, Suite 108
> Oakland, CA 94609
> (415) 326-3173

Sincerely,

Anthony M. Barnes
Jason R. Flanders
ATA Law Group
Counsel for Orange County Coastkeeper

19



# SERVICE LIST

<u>VIA U.S. CERTIFIED MAIL – Return Receipt Requested</u>

William Barr
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

Mike Stoker
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Andrew Wheeler
Acting Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Hope Smythe
Executive Officer
Regional Water Quality Control Board
Santa Ana Region
3737 Main Street, Suite 500
Riverside, California 92501

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| 2018 - 2019 REPORTING YEAR | | | | | | | | | |
| C | 11/29/2018 | Sample Point #1 | Zinc (H) | 0.32 | mg/L | 0.11 | 2.91 | 0.12 | 2.67 |
| C | 11/29/2018 | Sample Point #1 | Aluminum | 3.6 | mg/L | 0.75 | 4.80 | none | N/A |
| C | 11/29/2018 | Sample Point #1 | Copper (H) | 0.042 | mg/L | 0.0123 | 3.41 | 0.013 | 3.23 |
| C | 11/29/2018 | Sample Point #1 | Iron | 2.1 | mg/L | 1 | 2.10 | none | N/A |
| C | 11/29/2018 | Sample Point #1 | N+N | 2.6 | mg/L | 0.68 | 3.82 | none | N/A |
| C | 11/29/2018 | Sample Point #2 | Zinc (H) | 0.48 | mg/L | 0.11 | 4.36 | 0.12 | 4.00 |
| C | 11/29/2018 | Sample Point #2 | Aluminum | 4.2 | mg/L | 0.75 | 5.60 | none | N/A |
| C | 11/29/2018 | Sample Point #2 | Copper (H) | 0.085 | mg/L | 0.0123 | 6.91 | 0.013 | 6.54 |
| C | 11/29/2018 | Sample Point #2 | Iron | 3 | mg/L | 1 | 3.00 | none | N/A |
| D | 11/29/2018 | Sample Point #1 | Zinc (H) | 0.186 | mg/L | 0.11 | 1.69 | 0.12 | 1.55 |
| D | 11/29/2018 | Sample Point #2 | Zinc (H) | 0.133 | mg/L | 0.11 | 1.21 | 0.12 | 1.11 |
| D | 11/29/2018 | Sample Point #3 | Zinc (H) | 0.236 | mg/L | 0.11 | 2.15 | 0.12 | 1.97 |
| D | 11/29/2018 | Sample Point #4 | Zinc (H) | 0.282 | mg/L | 0.11 | 2.56 | 0.12 | 2.35 |
| D | 11/29/2018 | Sample Point #5 | Zinc (H) | 0.164 | mg/L | 0.11 | 1.49 | 0.12 | 1.37 |
| D | 11/29/2018 | Sample Point #6 | Zinc (H) | 0.311 | mg/L | 0.11 | 2.83 | 0.12 | 2.59 |
| D | 11/29/2018 | Sample Point #7 | Zinc (H) | 0.312 | mg/L | 0.11 | 2.84 | 0.12 | 2.60 |
| D | 11/29/2018 | Sample Point #1 | Aluminum | 1.02 | mg/L | 0.75 | 1.36 | none | N/A |
| D | 11/29/2018 | Sample Point #2 | Aluminum | 1 | mg/L | 0.75 | 1.33 | none | N/A |
| D | 11/29/2018 | Sample Point #3 | Aluminum | 3.56 | mg/L | 0.75 | 4.75 | none | N/A |
| D | 11/29/2018 | Sample Point #4 | Aluminum | 1.69 | mg/L | 0.75 | 2.25 | none | N/A |
| D | 11/29/2018 | Sample Point #5 | Aluminum | 1.44 | mg/L | 0.75 | 1.92 | none | N/A |
| D | 11/29/2018 | Sample Point #6 | Aluminum | 1.13 | mg/L | 0.75 | 1.51 | none | N/A |
| D | 11/29/2018 | Sample Point #1 | Magnesium | 0.547 | mg/L | 0.064 | 8.55 | none | N/A |
| D | 11/29/2018 | Sample Point #2 | Magnesium | 0.871 | mg/L | 0.064 | 13.61 | none | N/A |
| D | 11/29/2018 | Sample Point #3 | Magnesium | 0.822 | mg/L | 0.064 | 12.84 | none | N/A |
| D | 11/29/2018 | Sample Point #4 | Magnesium | 1.06 | mg/L | 0.064 | 16.56 | none | N/A |
| D | 11/29/2018 | Sample Point #5 | Magnesium | 0.747 | mg/L | 0.064 | 11.67 | none | N/A |
| D | 11/29/2018 | Sample Point #6 | Magnesium | 0.924 | mg/L | 0.064 | 14.44 | none | N/A |
| D | 11/29/2018 | Sample Point #7 | Magnesium | 0.737 | mg/L | 0.064 | 11.52 | none | N/A |
| D | 11/29/2018 | Sample Point #1 | Copper (H) | 0.0161 | mg/L | 0.0123 | 1.31 | 0.013 | 1.24 |
| D | 11/29/2018 | Sample Point #2 | Copper (H) | 0.0204 | mg/L | 0.0123 | 1.66 | 0.013 | 1.57 |
| D | 11/29/2018 | Sample Point #3 | Copper (H) | 0.0318 | mg/L | 0.0123 | 2.59 | 0.013 | 2.45 |
| D | 11/29/2018 | Sample Point #4 | Copper (H) | 0.0766 | mg/L | 0.0123 | 6.23 | 0.013 | 5.89 |
| D | 11/29/2018 | Sample Point #5 | Copper (H) | 0.0267 | mg/L | 0.0123 | 2.17 | 0.013 | 2.05 |
| D | 11/29/2018 | Sample Point #6 | Copper (H) | 0.0354 | mg/L | 0.0123 | 2.88 | 0.013 | 2.72 |
| D | 11/29/2018 | Sample Point #7 | Copper (H) | 0.0555 | mg/L | 0.0123 | 4.51 | 0.013 | 4.27 |
| D | 11/29/2018 | Sample Point #1 | Iron | 2.76 | mg/L | 1 | 2.76 | none | N/A |
| D | 11/29/2018 | Sample Point #2 | Iron | 1.32 | mg/L | 1 | 1.32 | none | N/A |
| D | 11/29/2018 | Sample Point #3 | Iron | 3.34 | mg/L | 1 | 3.34 | none | N/A |
| D | 11/29/2018 | Sample Point #6 | Iron | 1.67 | mg/L | 1 | 1.67 | none | N/A |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 11/29/2018 | Sample Point #3 | N+N | 2.08 | mg/L | 0.68 | 3.06 | none | N/A |
| D | 11/29/2018 | Sample Point #4 | N+N | 3 | mg/L | 0.68 | 4.41 | none | N/A |
| D | 11/29/2018 | Sample Point #5 | N+N | 0.937 | mg/L | 0.68 | 1.38 | none | N/A |
| D | 11/29/2018 | Sample Point #7 | N+N | 0.745 | mg/L | 0.68 | 1.10 | none | N/A |
| D | 11/29/2018 | Sample Point #3 | pH | 8.63 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .13 s.u. above |
| | | | 2017 - 2018 REPORTING YEAR | | | | | | |
| D | 1/8/2018 | Sample Point #1 | Zinc (H) | 0.369 | mg/L | 0.11 | 3.35 | 0.12 | 3.08 |
| D | 1/8/2018 | Sample Point #2 | Zinc (H) | 0.205 | mg/L | 0.11 | 1.86 | 0.12 | 1.71 |
| D | 1/8/2018 | Sample Point #3 | Zinc (H) | 0.487 | mg/L | 0.11 | 4.43 | 0.12 | 4.06 |
| D | 1/8/2018 | Sample Point #4 | Zinc (H) | 0.65 | mg/L | 0.11 | 5.91 | 0.12 | 5.42 |
| D | 1/8/2018 | Sample Point #5 | Zinc (H) | 0.918 | mg/L | 0.11 | 8.35 | 0.12 | 7.65 |
| D | 1/8/2018 | Sample Point #6 | Zinc (H) | 0.255 | mg/L | 0.11 | 2.32 | 0.12 | 2.13 |
| D | 1/8/2018 | Sample Point #7 | Zinc (H) | 1.24 | mg/L | 0.11 | 11.27 | 0.12 | 10.33 |
| D | 1/8/2018 | Sample Point #1 | Lead (H) | 0.554 | mg/L | 0.069 | 8.03 | 0.064 | 8.66 |
| D | 1/8/2018 | Sample Point #2 | Lead (H) | 0.215 | mg/L | 0.069 | 3.12 | 0.064 | 3.36 |
| D | 1/8/2018 | Sample Point #3 | Lead (H) | 0.624 | mg/L | 0.069 | 9.04 | 0.064 | 9.75 |
| D | 1/8/2018 | Sample Point #4 | Lead (H) | 0.129 | mg/L | 0.069 | 1.87 | 0.064 | 2.02 |
| D | 1/8/2018 | Sample Point #5 | Lead (H) | 0.829 | mg/L | 0.069 | 12.01 | 0.064 | 12.95 |
| D | 1/8/2018 | Sample Point #6 | Lead (H) | 0.339 | mg/L | 0.069 | 4.91 | 0.064 | 5.30 |
| D | 1/8/2018 | Sample Point #7 | Lead (H) | 0.456 | mg/L | 0.069 | 6.61 | 0.064 | 7.13 |
| D | 1/8/2018 | Sample Point #1 | Copper (H) | 0.017 | mg/L | 0.0123 | 1.38 | 0.013 | 1.31 |
| D | 1/8/2018 | Sample Point #2 | Copper (H) | 0.0261 | mg/L | 0.0123 | 2.12 | 0.013 | 2.01 |
| D | 1/8/2018 | Sample Point #3 | Copper (H) | 0.042 | mg/L | 0.0123 | 3.41 | 0.013 | 3.23 |
| D | 1/8/2018 | Sample Point #4 | Copper (H) | 0.135 | mg/L | 0.0123 | 10.98 | 0.013 | 10.38 |
| D | 1/8/2018 | Sample Point #5 | Copper (H) | 0.0874 | mg/L | 0.0123 | 7.11 | 0.013 | 6.72 |
| D | 1/8/2018 | Sample Point #6 | Copper (H) | 0.0481 | mg/L | 0.0123 | 3.91 | 0.013 | 3.70 |
| D | 1/8/2018 | Sample Point #7 | Copper (H) | 0.305 | mg/L | 0.0123 | 24.80 | 0.013 | 23.46 |
| D | 1/8/2018 | Sample Point #1 | Iron | 2.24 | mg/L | 1 | 1.03 | none | N/A |
| D | 1/8/2018 | Sample Point #3 | Iron | 1.97 | mg/L | 1 | 5.33 | none | N/A |
| D | 1/8/2018 | Sample Point #4 | Iron | 1.1 | mg/L | 1 | 2.53 | none | N/A |
| D | 1/8/2018 | Sample Point #5 | Iron | 1.98 | mg/L | 1 | 1.52 | none | N/A |
| D | 1/8/2018 | Sample Point #6 | Iron | 1.07 | mg/L | 1 | 4.41 | none | N/A |
| D | 1/8/2018 | Sample Point #2 | N+N | 0.961 | mg/L | 0.68 | 1.41 | none | N/A |
| D | 1/8/2018 | Sample Point #3 | N+N | 5.19 | mg/L | 0.68 | 7.63 | none | N/A |
| D | 1/8/2018 | Sample Point #4 | N+N | 6.84 | mg/L | 0.68 | 10.06 | none | N/A |
| D | 1/8/2018 | Sample Point #5 | N+N | 3.77 | mg/L | 0.68 | 5.54 | none | N/A |
| D | 1/8/2018 | Sample Point #6 | N+N | 0.948 | mg/L | 0.68 | 1.39 | none | N/A |
| D | 1/8/2018 | Sample Point #7 | N+N | 2.73 | mg/L | 0.68 | 4.01 | none | N/A |
| D | 1/8/2018 | Sample Point #1 | Aluminum | 1.32 | mg/L | 0.75 | 1.76 | none | N/A |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 1/8/2018 | Sample Point #2 | Aluminum | 0.825 | mg/L | 0.75 | 1.10 | none | N/A |
| D | 1/8/2018 | Sample Point #3 | Aluminum | 2.56 | mg/L | 0.75 | 3.41 | none | N/A |
| D | 1/8/2018 | Sample Point #4 | Aluminum | 1.5 | mg/L | 0.75 | 2.00 | none | N/A |
| D | 1/8/2018 | Sample Point #5 | Aluminum | 1.95 | mg/L | 0.75 | 2.60 | none | N/A |
| D | 1/8/2018 | Sample Point #6 | Aluminum | 1.66 | mg/L | 0.75 | 2.21 | none | N/A |
| D | 1/8/2018 | Sample Point #1 | Magnesium | 0.846 | mg/L | 0.064 | 13.22 | none | N/A |
| D | 1/8/2018 | Sample Point #2 | Magnesium | 0.899 | mg/L | 0.064 | 14.05 | none | N/A |
| D | 1/8/2018 | Sample Point #3 | Magnesium | 0.966 | mg/L | 0.064 | 15.09 | none | N/A |
| D | 1/8/2018 | Sample Point #4 | Magnesium | 1.98 | mg/L | 0.064 | 30.94 | none | N/A |
| D | 1/8/2018 | Sample Point #5 | Magnesium | 3.08 | mg/L | 0.064 | 48.13 | none | N/A |
| D | 1/8/2018 | Sample Point #6 | Magnesium | 1.02 | mg/L | 0.064 | 15.94 | none | N/A |
| D | 1/9/2018 | Sample Point #7 | Magnesium | 1.49 | mg/L | 0.064 | 23.28 | none | N/A |
| D | 3/22/2018 | Sample Point #1 | Zinc (H) | 0.118 | mg/L | 0.11 | 1.07 | 0.12 | N/A |
| D | 3/22/2018 | Sample Point #2 | Zinc (H) | 0.147 | mg/L | 0.11 | 1.34 | 0.12 | 1.23 |
| D | 3/22/2018 | Sample Point #3 | Zinc (H) | 0.315 | mg/L | 0.11 | 2.86 | 0.12 | 2.63 |
| D | 3/22/2018 | Sample Point #4 | Zinc (H) | 0.266 | mg/L | 0.11 | 2.42 | 0.12 | 2.22 |
| D | 3/22/2018 | Sample Point #5 | Zinc (H) | 0.295 | mg/L | 0.11 | 2.68 | 0.12 | 2.46 |
| D | 3/22/2018 | Sample Point #6 | Zinc (H) | 0.153 | mg/L | 0.11 | 1.39 | 0.12 | 1.28 |
| D | 3/22/2018 | Sample Point #7 | Zinc (H) | 0.231 | mg/L | 0.11 | 2.10 | 0.12 | 1.93 |
| D | 3/22/2018 | Sample Point #3 | Copper (H) | 0.055 | mg/L | 0.0123 | 4.47 | 0.013 | 4.23 |
| D | 3/22/2018 | Sample Point #4 | Copper (H) | 0.091 | mg/L | 0.0123 | 7.40 | 0.013 | 7.00 |
| D | 3/22/2018 | Sample Point #5 | Copper (H) | 0.051 | mg/L | 0.0123 | 4.15 | 0.013 | 3.92 |
| D | 3/22/2018 | Sample Point #6 | Copper (H) | 0.0331 | mg/L | 0.0123 | 2.69 | 0.013 | 2.55 |
| D | 3/22/2018 | Sample Point #7 | Copper (H) | 0.0334 | mg/L | 0.0123 | 2.72 | 0.013 | 2.57 |
| D | 3/22/2018 | Sample Point #3 | Iron | 3.5 | mg/L | 1 | 3.50 | none | N/A |
| D | 3/22/2018 | Sample Point #4 | Iron | 1.18 | mg/L | 1 | 1.18 | none | N/A |
| D | 3/22/2018 | Sample Point #5 | Iron | 1.86 | mg/L | 1 | 1.86 | none | N/A |
| D | 3/22/2018 | Sample Point #6 | Iron | 1.21 | mg/L | 1 | 1.21 | none | N/A |
| D | 3/22/2018 | Sample Point #3 | N+N | 1.67 | mg/L | 0.68 | 2.46 | none | N/A |
| D | 3/22/2018 | Sample Point #4 | N+N | 2.42 | mg/L | 0.68 | 3.56 | none | N/A |
| D | 3/22/2018 | Sample Point #5 | N+N | 1.17 | mg/L | 0.68 | 1.72 | none | N/A |
| D | 3/22/2018 | Sample Point #3 | Aluminum | 3.68 | mg/L | 0.75 | 4.91 | none | N/A |
| D | 3/22/2018 | Sample Point #4 | Aluminum | 1.53 | mg/L | 0.75 | 2.04 | none | N/A |
| D | 3/22/2018 | Sample Point #5 | Aluminum | 2.13 | mg/L | 0.75 | 2.84 | none | N/A |
| D | 3/22/2018 | Sample Point #6 | Aluminum | 1.08 | mg/L | 0.75 | 1.44 | none | N/A |
| D | 3/22/2018 | Sample Point #1 | Magnesium | 0.569 | mg/L | 0.064 | 8.89 | none | N/A |
| D | 3/22/2018 | Sample Point #2 | Magnesium | 0.36 | mg/L | 0.064 | 5.63 | none | N/A |
| D | 3/22/2018 | Sample Point #3 | Magnesium | 1.21 | mg/L | 0.064 | 18.91 | none | N/A |
| D | 3/22/2018 | Sample Point #4 | Magnesium | 1.17 | mg/L | 0.064 | 18.28 | none | N/A |
| D | 3/22/2018 | Sample Point #5 | Magnesium | 1.8 | mg/L | 0.064 | 28.13 | none | N/A |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 3/22/2018 | Sample Point #6 | Magnesium | 0.898 | mg/L | 0.064 | 14.03 | none | N/A |
| D | 3/22/2018 | Sample Point #7 | Magnesium | 0.441 | mg/L | 0.064 | 6.89 | none | N/A |
| | | | **2016 - 2017 REPORTING YEAR** | | | | | | |
| D | 12/16/2016 | Sample Point #1 | Zinc (H) | 0.206 | mg/L | 0.11 | 1.87 | 0.12 | 1.72 |
| D | 12/16/2016 | Sample Point #3 | Zinc (H) | 0.18 | mg/L | 0.11 | 1.64 | 0.12 | 1.50 |
| D | 12/16/2016 | Sample Point #4 | Zinc (H) | 0.481 | mg/L | 0.11 | 4.37 | 0.12 | 4.01 |
| D | 12/16/2016 | Sample Point #5 | Zinc (H) | 0.274 | mg/L | 0.11 | 2.49 | 0.12 | 2.28 |
| D | 12/16/2016 | Sample Point #6 | Zinc (H) | 0.205 | mg/L | 0.11 | 1.86 | 0.12 | 1.71 |
| D | 12/16/2016 | Sample Point #7 | Zinc (H) | 0.743 | mg/L | 0.11 | 6.75 | 0.12 | 6.19 |
| D | 12/16/2016 | Sample Point #3 | Aluminum | 1.79 | mg/L | 0.75 | 2.39 | none | N/A |
| D | 12/16/2016 | Sample Point #4 | Aluminum | 1.07 | mg/L | 0.75 | 1.43 | none | N/A |
| D | 12/16/2016 | Sample Point #5 | Aluminum | 0.917 | mg/L | 0.75 | 1.22 | none | N/A |
| D | 12/16/2016 | Sample Point #6 | Aluminum | 1.05 | mg/L | 0.75 | 1.40 | none | N/A |
| D | 12/16/2016 | Sample Point #3 | N+N | 2.2 | mg/L | 0.68 | 3.24 | none | N/A |
| D | 12/16/2016 | Sample Point #4 | N+N | 2 | mg/L | 0.68 | 2.94 | none | N/A |
| D | 12/16/2016 | Sample Point #6 | N+N | 1.1 | mg/L | 0.68 | 1.62 | none | N/A |
| D | 12/16/2016 | Sample Point #3 | Iron | 1.14 | mg/L | 1 | 1.14 | none | N/A |
| D | 12/16/2016 | Sample Point #6 | Iron | 1.98 | mg/L | 1 | 1.98 | none | N/A |
| D | 12/16/2016 | Sample Point #6 | pH | 8.65 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .15 s.u. above |
| D | 12/21/2016 | Sample Point #1 | Zinc (H) | 0.324 | mg/L | 0.11 | 2.95 | 0.12 | 2.70 |
| D | 12/21/2016 | Sample Point #2 | Zinc (H) | 0.639 | mg/L | 0.11 | 5.81 | 0.12 | 5.33 |
| D | 12/21/2016 | Sample Point #3 | Zinc (H) | 0.507 | mg/L | 0.11 | 4.61 | 0.12 | 4.23 |
| D | 12/21/2016 | Sample Point #4 | Zinc (H) | 0.358 | mg/L | 0.11 | 3.25 | 0.12 | 2.98 |
| D | 12/21/2016 | Sample Point #5 | Zinc (H) | 0.641 | mg/L | 0.11 | 5.83 | 0.12 | 5.34 |
| D | 12/21/2016 | Sample Point #6 | Zinc (H) | 0.257 | mg/L | 0.11 | 2.34 | 0.12 | 2.14 |
| D | 12/21/2016 | Sample Point #7 | Zinc (H) | 0.777 | mg/L | 0.11 | 7.06 | 0.12 | 6.48 |
| D | 12/21/2016 | Sample Point #2 | Aluminum | 3.13 | mg/L | 0.75 | 4.17 | none | N/A |
| D | 12/21/2016 | Sample Point #3 | Aluminum | 3.36 | mg/L | 0.75 | 4.48 | none | N/A |
| D | 12/21/2016 | Sample Point #4 | Aluminum | 2.09 | mg/L | 0.75 | 2.79 | none | N/A |
| D | 12/21/2016 | Sample Point #5 | Aluminum | 4.55 | mg/L | 0.75 | 6.07 | none | N/A |
| D | 12/21/2016 | Sample Point #1 | Total Suspended Solids | 132 | mg/L | 100 | 1.32 | none | N/A |
| D | 12/21/2016 | Sample Point #3 | N+N | 1.8 | mg/L | 0.68 | 3.24 | none | N/A |
| D | 12/21/2016 | Sample Point #4 | N+N | 6.7 | mg/L | 0.68 | 2.94 | none | N/A |
| D | 12/21/2016 | Sample Point #1 | Iron | 1.03 | mg/L | 1 | 1.03 | none | N/A |
| D | 12/21/2016 | Sample Point #2 | Iron | 5.33 | mg/L | 1 | 5.33 | none | N/A |
| D | 12/21/2016 | Sample Point #3 | Iron | 2.53 | mg/L | 1 | 2.53 | none | N/A |
| D | 12/21/2016 | Sample Point #4 | Iron | 1.52 | mg/L | 1 | 1.52 | none | N/A |
| D | 12/21/2016 | Sample Point #5 | Iron | 4.41 | mg/L | 1 | 4.41 | none | N/A |
| D | 12/21/2016 | Sample Point #6 | Iron | 1.04 | mg/L | 1 | 1.04 | none | N/A |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 12/21/2016 | Sample Point #2 | pH | 8.54 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .04 s.u. above |
| D | 1/5/2017 | Sample Point #1 | Zinc (H) | 1.49 | mg/L | 0.11 | 13.55 | 0.12 | 12.42 |
| D | 1/5/2017 | Sample Point #2 | Zinc (H) | 0.421 | mg/L | 0.11 | 3.83 | 0.12 | 3.51 |
| D | 1/5/2017 | Sample Point #3 | Zinc (H) | 0.479 | mg/L | 0.11 | 4.35 | 0.12 | 3.99 |
| D | 1/5/2017 | Sample Point #4 | Zinc (H) | 0.716 | mg/L | 0.11 | 6.51 | 0.12 | 5.97 |
| D | 1/5/2017 | Sample Point #5 | Zinc (H) | 0.838 | mg/L | 0.11 | 7.62 | 0.12 | 6.98 |
| D | 1/5/2017 | Sample Point #6 | Zinc (H) | 0.354 | mg/L | 0.11 | 3.22 | 0.12 | 2.95 |
| D | 1/5/2017 | Sample Point #7 | Zinc (H) | 2.15 | mg/L | 0.11 | 19.55 | 0.12 | 17.92 |
| D | 1/5/2017 | Sample Point #1 | Aluminum | 4.05 | mg/L | 0.75 | 5.40 | none | N/A |
| D | 1/5/2017 | Sample Point #2 | Aluminum | 1.44 | mg/L | 0.75 | 1.92 | none | N/A |
| D | 1/5/2017 | Sample Point #3 | Aluminum | 4.64 | mg/L | 0.75 | 6.19 | none | N/A |
| D | 1/5/2017 | Sample Point #4 | Aluminum | 3.33 | mg/L | 0.75 | 4.44 | none | N/A |
| D | 1/5/2017 | Sample Point #5 | Aluminum | 4.99 | mg/L | 0.75 | 6.65 | none | N/A |
| D | 1/5/2017 | Sample Point #6 | Aluminum | 1.04 | mg/L | 0.75 | 1.39 | none | N/A |
| D | 1/5/2017 | Sample Point #1 | Total Suspended Solids | 132 | mg/L | 100 | 1.32 | none | N/A |
| D | 1/5/2017 | Sample Point #3 | N+N | 1.6 | mg/L | 0.68 | 2.35 | none | N/A |
| D | 1/5/2017 | Sample Point #4 | N+N | 5.4 | mg/L | 0.68 | 7.94 | none | N/A |
| D | 1/5/2017 | Sample Point #5 | N+N | 1.5 | mg/L | 0.68 | 2.21 | none | N/A |
| D | 1/5/2017 | Sample Point #1 | Iron | 13.6 | mg/L | 1 | 13.60 | none | N/A |
| D | 1/5/2017 | Sample Point #2 | Iron | 3.35 | mg/L | 1 | 3.35 | none | N/A |
| D | 1/5/2017 | Sample Point #3 | Iron | 4.54 | mg/L | 1 | 4.54 | none | N/A |
| D | 1/5/2017 | Sample Point #4 | Iron | 2.82 | mg/L | 1 | 2.82 | none | N/A |
| D | 1/5/2017 | Sample Point #5 | Iron | 4.54 | mg/L | 1 | 4.54 | none | N/A |
| D | 1/5/2017 | Sample Point #6 | Iron | 1.93 | mg/L | 1 | 1.93 | none | N/A |
| D | 1/5/2017 | Sample Point #1 | pH | 8.81 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .31 s.u. above |
| D | 1/6/2017 | Sample Point #2 | pH | 8.79 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .29 s.u. above |
| D | 1/7/2017 | Sample Point #3 | pH | 9 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .5 s.u. above |
| D | 1/9/2017 | Sample Point #1 | Zinc (H) | 0.216 | mg/L | 0.11 | 1.96 | 0.12 | 1.80 |
| D | 1/9/2017 | Sample Point #3 | Zinc (H) | 0.203 | mg/L | 0.11 | 1.85 | 0.12 | 1.69 |
| D | 1/9/2017 | Sample Point #4 | Zinc (H) | 0.198 | mg/L | 0.11 | 1.80 | 0.12 | 1.65 |
| D | 1/9/2017 | Sample Point #5 | Zinc (H) | 0.291 | mg/L | 0.11 | 2.65 | 0.12 | 2.43 |
| D | 1/9/2017 | Sample Point #6 | Zinc (H) | 0.251 | mg/L | 0.11 | 2.28 | 0.12 | 2.09 |
| D | 1/9/2017 | Sample Point #7 | Zinc (H) | 0.692 | mg/L | 0.11 | 6.29 | 0.12 | 5.77 |
| D | 1/9/2017 | Sample Point #3 | Aluminum | 1.4 | mg/L | 0.75 | 1.87 | none | N/A |
| D | 1/9/2017 | Sample Point #4 | Aluminum | 0.81 | mg/L | 0.75 | 1.08 | none | N/A |
| D | 1/9/2017 | Sample Point #5 | Aluminum | 0.788 | mg/L | 0.75 | 1.05 | none | N/A |
| D | 1/9/2017 | Sample Point #6 | Aluminum | 1.3 | mg/L | 0.75 | 1.73 | none | N/A |
| D | 1/9/2017 | Sample Point #3 | N+N | 1.1 | mg/L | 0.68 | 1.62 | none | N/A |
| D | 1/9/2017 | Sample Point #4 | N+N | 0.97 | mg/L | 0.68 | 1.43 | none | N/A |
| D | 1/9/2017 | Sample Point #3 | Iron | 1.27 | mg/L | 1 | 1.27 | none | N/A |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 1/9/2017 | Sample Point #6 | Iron | 1.65 | mg/L | 1 | 1.65 | none | N/A |
| D | 1/9/2017 | Sample Point #2 | pH | 8.68 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .18 s.u. above |
| D | 1/9/2017 | Sample Point #3 | pH | 8.8 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .3 s.u. above |
| D | 1/19/2017 | Sample Point #1 | Zinc (H) | 0.194 | mg/L | 0.11 | 1.76 | 0.12 | 1.62 |
| D | 1/19/2017 | Sample Point #2 | Zinc (H) | 0.285 | mg/L | 0.11 | 2.59 | 0.12 | 2.38 |
| D | 1/19/2017 | Sample Point #3 | Zinc (H) | 0.282 | mg/L | 0.11 | 2.56 | 0.12 | 2.35 |
| D | 1/19/2017 | Sample Point #5 | Zinc (H) | 0.198 | mg/L | 0.11 | 1.80 | 0.12 | 1.65 |
| D | 1/19/2017 | Sample Point #6 | Zinc (H) | 0.135 | mg/L | 0.11 | 1.23 | 0.12 | 1.13 |
| D | 1/19/2017 | Sample Point #7 | Zinc (H) | 0.706 | mg/L | 0.11 | 6.42 | 0.12 | 5.88 |
| D | 1/19/2017 | Sample Point #3 | Aluminum | 0.928 | mg/L | 0.75 | 1.24 | none | N/A |
| D | 1/19/2017 | Sample Point #5 | Aluminum | 0.798 | mg/L | 0.75 | 1.06 | none | N/A |
| D | 1/19/2017 | Sample Point #4 | N+N | 0.74 | mg/L | 0.68 | 1.09 | none | N/A |
| D | 1/19/2017 | Sample Point #3 | Iron | 1.08 | mg/L | 1 | 1.08 | none | N/A |
| D | 1/19/2017 | Sample Point #4 | Iron | 1.17 | mg/L | 1 | 1.17 | none | N/A |
| D | 2/6/2017 | Sample Point #2 | Zinc (H) | 0.112 | mg/L | 0.11 | 1.02 | 0.12 | N/A |
| D | 2/6/2017 | Sample Point #3 | Zinc (H) | 0.388 | mg/L | 0.11 | 3.53 | 0.12 | 3.23 |
| D | 2/6/2017 | Sample Point #4 | Zinc (H) | 0.125 | mg/L | 0.11 | 1.14 | 0.12 | 1.04 |
| D | 2/6/2017 | Sample Point #5 | Zinc (H) | 0.406 | mg/L | 0.11 | 3.69 | 0.12 | 3.38 |
| D | 2/6/2017 | Sample Point #7 | Zinc (H) | 0.499 | mg/L | 0.11 | 4.54 | 0.12 | 4.16 |
| D | 2/6/2017 | Sample Point #3 | Aluminum | 1.62 | mg/L | 0.75 | 2.16 | none | N/A |
| D | 2/6/2017 | Sample Point #3 | Iron | 1.08 | mg/L | 1 | 1.08 | none | N/A |
| D | 2/17/2017 | Sample Point #2 | Zinc (H) | 0.149 | mg/L | 0.11 | 1.35 | 0.12 | 1.24 |
| D | 2/17/2017 | Sample Point #3 | Zinc (H) | 0.164 | mg/L | 0.11 | 1.49 | 0.12 | 1.37 |
| D | 2/17/2017 | Sample Point #4 | Zinc (H) | 0.27 | mg/L | 0.11 | 2.45 | 0.12 | 2.25 |
| D | 2/17/2017 | Sample Point #5 | Zinc (H) | 0.412 | mg/L | 0.11 | 3.75 | 0.12 | 3.43 |
| D | 2/17/2017 | Sample Point #6 | Zinc (H) | 0.607 | mg/L | 0.11 | 5.52 | 0.12 | 5.06 |
| D | 2/17/2017 | Sample Point #7 | Zinc (H) | 1.64 | mg/L | 1.11 | 1.48 | 1.12 | 1.46 |
| D | 2/17/2017 | Sample Point #3 | Aluminum | 1.46 | mg/L | 0.75 | 1.95 | none | N/A |
| D | 2/17/2017 | Sample Point #3 | N+N | 1.84 | mg/L | 0.68 | 2.71 | none | N/A |
| D | 2/17/2017 | Sample Point #4 | N+N | 1.43 | mg/L | 0.68 | 2.10 | none | N/A |
| D | 2/17/2017 | Sample Point #5 | N+N | 0.82 | mg/L | 0.68 | 1.21 | none | N/A |
| D | 2/17/2017 | Sample Point #6 | N+N | 0.729 | mg/L | 0.68 | 1.07 | none | N/A |
| | | | **2015 - 2016 REPORTING YEAR** | | | | | | |
| D | 9/15/2015 | Sample Point #1 | Zinc (H) | 0.25 | mg/L | 0.11 | 2.27 | 0.12 | 2.08 |
| D | 9/15/2015 | Sample Point #2 | Zinc (H) | 0.13 | mg/L | 0.11 | 1.18 | 0.12 | 1.08 |
| D | 9/15/2015 | Sample Point #3 | Zinc (H) | 0.14 | mg/L | 0.11 | 1.27 | 0.12 | 1.17 |
| D | 9/15/2015 | Sample Point #4 | Zinc (H) | 0.36 | mg/L | 0.11 | 3.27 | 0.12 | 3.00 |
| D | 9/15/2015 | Sample Point #5 | Zinc (H) | 0.4 | mg/L | 0.11 | 3.27 | 0.12 | 3.33 |
| D | 9/15/2015 | Sample Point #6 | Zinc (H) | 0.18 | mg/L | 0.11 | 3.64 | 0.12 | 1.50 |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 9/15/2015 | Sample Point #1 | Aluminum | 0.93 | mg/L | 0.75 | 1.24 | none | N/A |
| D | 9/15/2015 | Sample Point #3 | Aluminum | 2.2 | mg/L | 0.75 | 2.93 | none | N/A |
| D | 9/15/2015 | Sample Point #1 | Iron | 1.47 | mg/L | 1 | 1.47 | none | N/A |
| D | 9/15/2015 | Sample Point #3 | N+N | 1.86 | mg/L | 0.68 | 2.74 | none | N/A |
| D | 9/15/2015 | Sample Point #4 | N+N | 2.3 | mg/L | 0.68 | 3.38 | none | N/A |
| D | 9/15/2015 | Sample Point #5 | N+N | 0.83 | mg/L | 0.68 | 1.22 | none | N/A |
| D | 1/5/2016 | Sample Point #1 | Zinc (H) | 0.21 | mg/L | 0.11 | 1.91 | 0.12 | 1.75 |
| D | 1/5/2016 | Sample Point #2 | Zinc (H) | 0.14 | mg/L | 0.11 | 1.27 | 0.12 | 1.17 |
| D | 1/5/2016 | Sample Point #3 | Zinc (H) | 0.22 | mg/L | 0.11 | 2.00 | 0.12 | 1.83 |
| D | 1/5/2016 | Sample Point #4 | Zinc (H) | 0.36 | mg/L | 0.11 | 3.27 | 0.12 | 3.00 |
| D | 1/5/2016 | Sample Point #5 | Zinc (H) | 0.43 | mg/L | 0.11 | 3.91 | 0.12 | 3.58 |
| D | 1/5/2016 | Sample Point #6 | Zinc (H) | 0.69 | mg/L | 0.11 | 6.27 | 0.12 | 5.75 |
| D | 1/5/2016 | Sample Point #1 | Aluminum | 1.3 | mg/L | 0.75 | 1.73 | none | N/A |
| D | 1/5/2016 | Sample Point #3 | Aluminum | 2.7 | mg/L | 0.75 | 3.60 | none | N/A |
| D | 1/5/2016 | Sample Point #4 | Aluminum | 0.88 | mg/L | 0.75 | 1.17 | none | N/A |
| D | 1/5/2016 | Sample Point #5 | Aluminum | 1.4 | mg/L | 0.75 | 1.87 | none | N/A |
| D | 1/5/2016 | Sample Point #6 | Aluminum | 1.7 | mg/L | 0.75 | 2.27 | none | N/A |
| D | 3/11/2016 | Sample Point #2 | Zinc (H) | 0.14 | mg/L | 0.11 | 1.27 | 0.12 | 1.17 |
| D | 3/11/2016 | Sample Point #3 | Zinc (H) | 0.24 | mg/L | 0.11 | 2.18 | 0.12 | 2.00 |
| D | 3/11/2016 | Sample Point #4 | Zinc (H) | 0.26 | mg/L | 0.11 | 2.36 | 0.12 | 2.17 |
| D | 3/11/2016 | Sample Point #5 | Zinc (H) | 0.27 | mg/L | 0.11 | 2.45 | 0.12 | 2.25 |
| D | 3/11/2016 | Sample Point #6 | Zinc (H) | 0.17 | mg/L | 0.11 | 1.55 | 0.12 | 1.42 |
| D | 3/11/2016 | Sample Point #2 | Aluminum | 2.6 | mg/L | 0.75 | 3.47 | none | N/A |
| D | 3/11/2016 | Sample Point #3 | Aluminum | 1.3 | mg/L | 0.75 | 1.73 | none | N/A |
| D | 3/11/2016 | Sample Point #4 | Aluminum | 2.2 | mg/L | 0.75 | 2.93 | none | N/A |
| D | 3/12/2016 | Sample Point #5 | Aluminum | 2.1 | mg/L | 0.75 | 2.80 | none | N/A |
| D | 3/13/2016 | Sample Point #6 | Aluminum | 1.3 | mg/L | 0.75 | 1.73 | none | N/A |
| D | 3/11/2016 | Sample Point #3 | Iron | 1.26 | mg/L | 1 | 1.26 | none | N/A |
| D | 3/11/2016 | Sample Point #4 | Iron | 1.16 | mg/L | 1 | 1.16 | none | N/A |
| D | 5/6/2016 | Sample Point #1 | Zinc (H) | 0.417 | mg/L | 0.11 | 3.79 | 0.12 | 3.48 |
| D | 5/6/2016 | Sample Point #2 | Zinc (H) | 0.525 | mg/L | 0.11 | 4.77 | 0.12 | 4.38 |
| D | 5/6/2016 | Sample Point #3 | Zinc (H) | 0.408 | mg/L | 0.11 | 3.71 | 0.12 | 3.40 |
| D | 5/6/2016 | Sample Point #4 | Zinc (H) | 0.819 | mg/L | 0.11 | 7.45 | 0.12 | 6.83 |
| D | 5/6/2016 | Sample Point #5 | Zinc (H) | 0.862 | mg/L | 0.11 | 7.84 | 0.12 | 7.18 |
| D | 5/6/2016 | Sample Point #6 | Zinc (H) | 0.321 | mg/L | 0.11 | 2.92 | 0.12 | 2.68 |
| D | 5/6/2016 | Sample Point #4 | Aluminum | 2.39 | mg/L | 0.75 | 3.19 | none | N/A |
| D | 5/6/2016 | Sample Point #5 | Aluminum | 0.847 | mg/L | 0.75 | 1.13 | none | N/A |
| D | 5/6/2016 | Sample Point #6 | Aluminum | 1.18 | mg/L | 0.75 | 1.57 | none | N/A |
| D | 5/6/2016 | Sample Point #3 | N+N | 4.03 | mg/L | 0.68 | 5.93 | none | N/A |
| D | 5/6/2016 | Sample Point #4 | N+N | 7.41 | mg/L | 0.68 | 10.90 | none | N/A |

EXHIBIT A
Aluminum Precision Products, Inc. - Susan Street Facility

| Sample collected by Coastkeeper (C) or Discharger (D) | Date of sample collection | Sample Location | Parameter | Result | Units | Benchmark | Magnitude of Benchmark Exceedance | California Toxics Rule Criteria/WQO | Magnitude of CTR/WQO Exceedance |
|---|---|---|---|---|---|---|---|---|---|
| D | 5/6/2016 | Sample Point #5 | N+N | 3.05 | mg/L | 0.68 | 4.49 | none | N/A |
| D | 5/6/2016 | Sample Point #4 | Iron | 1.03 | mg/L | 1 | 1.03 | none | N/A |
| | | | 2014 - 2015 REPORTING YEAR | | | | | | |
| D | 12/2/2014 | Sample Point #1 | Zinc (H) | 0.397 | mg/L | 0.11 | 3.61 | 0.12 | 3.31 |
| D | 12/2/2014 | Sample Point #2 | Zinc (H) | 0.303 | mg/L | 0.11 | 2.75 | 0.12 | 2.53 |
| D | 12/2/2014 | Sample Point #3 | Zinc (H) | 0.319 | mg/L | 0.11 | 2.90 | 0.12 | 2.66 |
| D | 12/2/2014 | Sample Point #4 | Zinc (H) | 0.825 | mg/L | 0.11 | 7.50 | 0.12 | 6.88 |
| D | 12/2/2014 | Sample Point #5 | Zinc (H) | 2.98 | mg/L | 0.11 | 27.09 | 0.12 | 24.83 |
| D | 12/2/2014 | Sample Point #6 | Zinc (H) | 0.926 | mg/L | 0.11 | 8.42 | 0.12 | 7.72 |
| D | 12/2/2014 | Sample Point #3 | Aluminum | 4.49 | mg/L | 0.75 | 5.99 | none | N/A |
| D | 12/2/2014 | Sample Point #4 | Aluminum | 2.27 | mg/L | 0.75 | 3.03 | none | N/A |
| D | 12/2/2014 | Sample Point #5 | Aluminum | 2.53 | mg/L | 0.75 | 3.37 | none | N/A |
| D | 12/2/2014 | Sample Point #6 | Aluminum | 0.95 | mg/L | 0.75 | 1.27 | none | N/A |
| D | 12/2/2014 | Sample Point #1 | pH | 6.49 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .01 s.u. below |
| D | 12/2/2014 | Sample Point #5 | pH | 6.28 | s.u. | 6.0-9.0 | N/A | 6.5-8.5 | .22 s.u. below |
| D | 5/17/2015 | Sample Point #1 | Zinc (H) | 0.176 | mg/L | 0.11 | 1.60 | 0.12 | 1.47 |
| D | 5/17/2015 | Sample Point #2 | Zinc (H) | 0.399 | mg/L | 0.11 | 3.63 | 0.12 | 3.33 |
| D | 5/17/2015 | Sample Point #3 | Zinc (H) | 0.197 | mg/L | 0.11 | 1.79 | 0.12 | 1.64 |
| D | 5/17/2015 | Sample Point #4 | Zinc (H) | 0.146 | mg/L | 0.11 | 1.33 | 0.12 | 1.22 |
| D | 5/17/2015 | Sample Point #5 | Zinc (H) | 0.602 | mg/L | 0.11 | 5.47 | 0.12 | 5.02 |
| D | 5/17/2015 | Sample Point #6 | Zinc (H) | 0.252 | mg/L | 0.11 | 2.29 | 0.12 | 2.10 |
| D | 5/17/2015 | Sample Point #2 | Aluminum | 0.77 | mg/L | 0.75 | 1.03 | none | N/A |
| D | 5/17/2015 | Sample Point #4 | Aluminum | 2.11 | mg/L | 0.75 | 2.81 | none | N/A |
| | | | 2013 - 2014 Reporting Year | | | | | | |
| D | 2/28/2014 | Sample Point #3 | Zinc (H) | 0.188 | mg/L | 0.11 | 1.71 | 0.12 | 1.57 |
| D | 2/28/2014 | Sample Point #4 | Zinc (H) | 0.166 | mg/L | 0.11 | 1.51 | 0.12 | 1.38 |
| D | 2/28/2014 | Sample Point #5 | Zinc (H) | 0.345 | mg/L | 0.11 | 3.14 | 0.12 | 2.88 |
| D | 2/28/2014 | Sample Point #6 | Zinc (H) | 0.188 | mg/L | 0.11 | 1.71 | 0.12 | 1.57 |
| D | 2/28/2014 | Sample Point #3 | Aluminum | 1.7 | mg/L | 0.75 | 2.27 | none | N/A |
| D | 2/28/2014 | Sample Point #5 | Aluminum | 1.05 | mg/L | 0.75 | 1.40 | none | N/A |
| D | 2/28/2014 | Sample Point #6 | Aluminum | 1.28 | mg/L | 0.75 | 1.71 | none | N/A |
| | | | | | | Total Exceedances | 302 | | 145 |
| | *(H) - Hardness dependent: Assumes a hardness value of 75-100 mg/L | | | | | | | | |

EXHIBIT B

Rain Data - Santa Ana John Wayne Airport (Feb. 2014 - Feb. 2019)

| STATION | NAME | DATE | PRCP |
|---------|------|------|------|
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/27/2014 | 0.24 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/28/2014 | 1.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/1/2014 | 0.65 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 4/2/2014 | 0.12 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 4/25/2014 | 0.12 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/1/2014 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/2/2014 | 0.72 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/3/2014 | 0.6 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/12/2014 | 1.97 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/17/2014 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/30/2014 | 0.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/11/2015 | 0.6 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/26/2015 | 0.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/22/2015 | 0.22 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/23/2015 | 0.13 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/1/2015 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/2/2015 | 0.58 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/7/2015 | 0.39 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/8/2015 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/14/2015 | 0.37 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 5/15/2015 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 7/18/2015 | 0.18 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 7/19/2015 | 0.25 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 9/9/2015 | 0.29 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 9/15/2015 | 1.49 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/11/2015 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/13/2015 | 0.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/19/2015 | 0.16 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/22/2015 | 0.36 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/5/2016 | 0.88 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/6/2016 | 1.01 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/18/2016 | 0.3 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/6/2016 | 0.33 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/7/2016 | 0.25 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/11/2016 | 0.45 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/17/2016 | 0.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/23/2016 | 0.22 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/24/2016 | 0.58 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/20/2016 | 0.23 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/21/2016 | 0.36 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/26/2016 | 0.49 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/27/2016 | 0.18 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/15/2016 | 0.44 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/16/2016 | 0.69 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/21/2016 | 0.73 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/22/2016 | 0.71 |

EXHIBIT B

Rain Data - Santa Ana John Wayne Airport (Feb. 2014 - Feb. 2019)

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/23/2016 | 0.7 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/24/2016 | 0.31 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/31/2016 | 0.28 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/5/2017 | 0.3 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/9/2017 | 0.39 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/11/2017 | 0.12 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/12/2017 | 0.49 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/19/2017 | 0.7 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/20/2017 | 1.22 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/22/2017 | 2.27 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/23/2017 | 0.14 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/6/2017 | 1.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/7/2017 | 0.38 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/11/2017 | 0.14 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/17/2017 | 1.58 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/18/2017 | 0.15 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/26/2017 | 0.1 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/27/2017 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/8/2018 | 0.2 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/9/2018 | 0.9 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/26/2018 | 0.16 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/27/2018 | 0.16 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/10/2018 | 0.45 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/15/2018 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 3/22/2018 | 0.19 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/3/2018 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/12/2018 | 0.52 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 10/13/2018 | 0.21 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/22/2018 | 0.35 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 11/29/2018 | 0.77 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/5/2018 | 0.25 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 12/6/2018 | 3.24 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/5/2019 | 0.5 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/12/2019 | 1.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/14/2019 | 0.62 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/15/2019 | 0.95 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/16/2019 | 0.53 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/17/2019 | 0.52 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 1/31/2019 | 0.7 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/2/2019 | 1.55 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/3/2019 | 0.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/4/2019 | 0.63 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/5/2019 | 0.14 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/9/2019 | 0.23 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/10/2019 | 0.17 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/13/2019 | 0.27 |

EXHIBIT B

Rain Data - Santa Ana John Wayne Airport (Feb. 2014 - Feb. 2019)

| STATION | NAME | DATE | PRCP |
|---|---|---|---|
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/14/2019 | 2.11 |
| USW00093184 | SANTA ANA JOHN WAYNE AIRPORT, CA US | 2/15/2019 | 0.12 |